# ALLIED STRUCTURAL STEEL CO. *v.* SPANNAUS, ATTORNEY GENERAL OF MINNESOTA, ET AL.

No. 77–747.   Argued April 25, 1978—Decided June 28, 1978

STEWART, J., delivered the opinion of the Court, in which BURGER, C. J., and POWELL, REHNQUIST, and STEVENS, JJ., joined. BRENNAN, J., filed a dissenting opinion, in which WHITE and MARSHALL, JJ., joined, *post*, p. 251. BLACKMUN, J., took no part in the consideration or decision of the case.

*George B. Christensen* argued the cause for appellant. With him on the briefs were *Chester W. Nosal* and *John R. Kenefick.*

*Byron E. Starns,* Chief Deputy Attorney General of Minnesota, argued the cause for appellees. With him on the brief were *Warren Spannaus,* Attorney General, *pro se, Richard B. Allyn,* Solicitor General, and *Kent G. Harbison, Richard A.*

*Lockridge,* and *Jon K. Murphy,* Special Assistant Attorneys General.*

MR. JUSTICE STEWART delivered the opinion of the Court.

The issue in this case is whether the application of Minnesota's Private Pension Benefits Protection Act[1] to the appellant violates the Contract Clause of the United States Constitution.

I

In 1974 appellant Allied Structural Steel Co. (company), a corporation with its principal place of business in Illinois, maintained an office in Minnesota with 30 employees. Under the company's general pension plan, adopted in 1963 and qualified as a single-employer plan under § 401 of the Internal Revenue Code, 26 U. S. C. § 401 (1976 ed.),[2] salaried employees were covered as follows: At age 65 an employee was entitled to retire and receive a monthly pension generally computed by multiplying 1% of his average monthly earnings by the total number of his years of employment with the company.[3] Thus, an employee aged 65 or more could retire without satisfying any particular length-of-service requirement, but the size of his pension would reflect the length of his service with the company.[4] An employee could also

---

*Peter G. Nash, Eugene B. Granof,* and *Stanley T. Kaleczyc* filed a brief for the Chamber of Commerce of the United States as *amicus curiae* urging reversal.

[1] Minn. Stat. § 181B.01 *et seq.* (1974). This is the same Act that was considered in *Malone* v. *White Motor Corp.,* 435 U. S. 497, a case presenting a quite different legal issue.

[2] The plan was not the result of a collective-bargaining agreement, and no such agreement is at issue in this case.

[3] The employee could elect to receive instead a lump-sum payment.

[4] Thus, an employee whose average monthly earnings were $800 and who retired at 65 would receive eight dollars monthly if he had worked one year for the company and $320 monthly if he had worked for the company for 40 years.

become entitled to receive a pension, payable in full at age 65, if he met any one of the following requirements: (1) he had worked 15 years for the company and reached the age of 60; or (2) he was at least 55 years old and the sum of his age and his years of service with the company was at least 75; or (3) he was less than 55 years old but the sum of his age and his years of service with the company was at least 80. Once an employee satisfied any one of these conditions, his pension right became vested in the sense that any subsequent termination of employment would not affect his right to receive a monthly pension when he reached 65. Those employees who quit or were discharged before age 65 without fulfilling one of the other three conditions did not acquire any pension rights.

The company was the sole contributor to the pension trust fund, and each year it made contributions to the fund based on actuarial predictions of eventual payout needs. Although those contributions once made were irrevocable, in the sense that they remained part of the pension trust fund, the plan neither required the company to make specific contributions nor imposed any sanction on it for failing to contribute adequately to the fund.

The company not only retained a virtually unrestricted right to amend the plan in whole or in part, but was also free to terminate the plan and distribute the trust assets at any time and for any reason. In the event of a termination, the assets of the fund were to go, first, to meet the plan's obligation to those employees already retired and receiving pensions; second, to those eligible for retirement; and finally, if any balance remained, to the other employees covered under the plan whose pension rights had not yet vested.[5] Employees within each of these categories were assured payment only to the extent of the pension assets.

---

[5] Apart from termination of the fund and distribution of the trust assets, there was no other situation in which employees in this third category would receive anything from the pension fund.

The plan expressly stated:

> "No employee shall have any right to, or interest in, any part of the Trust's assets upon termination of his employment or otherwise, except as provided from time to time under this Plan, and then only to the extent of the benefits payable to such employee out of the assets of the Trust. All payments of benefits as provided for in this Plan shall be made solely out of the assets of the Trust and neither the employer, the trustee, nor any member of the Committee shall be liable therefor in any manner."

The plan also specifically advised employees that neither its existence nor any of its terms were to be understood as implying any assurance that employees could not be dismissed from their employment with the company at any time.

In sum, an employee who did not die, did not quit, and was not discharged before meeting one of the requirements of the plan would receive a fixed pension at age 65 if the company remained in business and elected to continue the pension plan in essentially its existing form.

On April 9, 1974, Minnesota enacted the law here in question, the Private Pension Benefits Protection Act, Minn. Stat. §§ 181B.01–181B.17. Under the Act, a private employer of 100 employees or more—at least one of whom was a Minnesota resident—who provided pension benefits under a plan meeting the qualifications of § 401 of the Internal Revenue Code, was subject to a "pension funding charge" if he either terminated the plan or closed a Minnesota office.[6] The charge was assessed if the pension funds were not sufficient to cover full pensions for all employees who had worked at least 10 years. The Act required the employer to satisfy the deficiency by purchasing deferred annuities, payable to the employees at their normal retirement age. A separate provi-

---

[6] Although the company had only 30 employees in Minnesota, it was subject to the Act because it had over 100 employees altogether.

sion specified that periods of employment prior to the effective date of the Act were to be included in the 10-year employment criterion.[7]

During the summer of 1974 the company began closing its Minnesota office. On July 31, it discharged 11 of its 30 Minnesota employees, and the following month it notified the Minnesota Commissioner of Labor and Industry, as required by the Act, that it was terminating an office in the State.[8] At least nine of the discharged employees did not have any vested pension rights under the company's plan, but had worked for the company for 10 years or more and thus qualified as pension obligees of the company under the law that Minnesota had enacted a few months earlier. On August 18, the State notified the company that it owed a pension funding charge of approximately $185,000 under the provisions of the Private Pension Benefits Protection Act.

The company brought suit in a Federal District Court ask-

---

[7] Entitled "Nonvested Benefits Prior to Act," Minn. Stat. § 181B.04 provided:

"Every employer who hereafter ceases to operate a place of employment or a pension plan within this state shall owe to his employees covered by sections 181B.01 to 181B.17 a pension funding charge which shall be equal to the present value of the total amount of nonvested pension benefits based upon service occurring before April 10, 1974 of such employees of the employer who have completed ten or more years of any covered service under the pension plan of the employer and whose nonvested pension benefits have been or will be forfeited because of the employer's ceasing to operate a place of employment or a pension plan, less the amount of such nonvested pension benefits which are compromised or settled to the satisfaction of the commissioner as provided in sections 181B.01 to 181B.17."

[8] According to the stipulated facts, the closing of the company's Minnesota office resulted from a shift of that office's duties to the main company office in Illinois the previous December. The closing was not completed until February 1975, by which time the Minnesota Act had been pre-empted by federal law. See *Malone* v. *White Motor Corp.*, 435 U. S., at 499. We deal here solely with the application of the Minnesota Act to the 11 employees discharged in July 1974.

ing for injunctive and declaratory relief. It claimed that the Act unconstitutionally impaired its contractual obligations to its employees under its pension agreement. The three-judge court upheld the constitutional validity of the Act as applied to the company, *Fleck* v. *Spannaus,* 449 F. Supp. 644, and an appeal was brought to this Court under 28 U. S. C. § 1253 (1976 ed.).[9] We noted probable jurisdiction. 434 U. S. 1045.

## II

## A

There can be no question of the impact of the Minnesota Private Pension Benefits Protection Act upon the company's contractual relationships with its employees. The Act substantially altered those relationships by superimposing pension obligations upon the company conspicuously beyond those that it had voluntarily agreed to undertake. But it does not inexorably follow that the Act, as applied to the company, violates the Contract Clause of the Constitution.

The language of the Contract Clause appears unambiguously absolute: "No State shall . . . pass any . . . Law impairing the Obligation of Contracts." U. S. Const., Art. I, § 10. The Clause is not, however, the Draconian provision that its words might seem to imply. As the Court has recognized, "literalism in the construction of the contract clause . . . would make it destructive of the public interest by depriving the State of its prerogative of self-protection." *W. B. Worthen Co.* v. *Thomas,* 292 U. S. 426, 433.[10]

---

[9] The claims of Walter Fleck and the other two individual plaintiffs were dismissed by the District Court for lack of standing, *Fleck* v. *Spannaus,* 421 F. Supp. 20, leaving only the company as an appellant. Warren Spannaus, the Attorney General of Minnesota, is an appellee.

[10] See generally B. Schwartz, A Commentary on the Constitution of the United States, Pt. 2, The Rights of Property 266–306 (1965); B. Wright, The Contract Clause of the Constitution (1938).

Although it was perhaps the strongest single constitutional check on state legislation during our early years as a Nation,[11] the Contract Clause receded into comparative desuetude with the adoption of the Fourteenth Amendment, and particularly with the development of the large body of jurisprudence under the Due Process Clause of that Amendment in modern constitutional history.[12] Nonetheless, the Contract Clause remains part of the Constitution. It is not a dead letter. And its basic contours are brought into focus by several of this Court's 20th-century decisions.

First of all, it is to be accepted as a commonplace that the Contract Clause does not operate to obliterate the police power of the States. "It is the settled law of this court that the interdiction of statutes impairing the obligation of contracts does not prevent the State from exercising such powers as are vested in it for the promotion of the common weal, or are necessary for the general good of the public, though contracts previously entered into between individuals may thereby be affected. This power, which in its various ramifications is known as the police power, is an exercise of the sovereign right of the Government to protect the lives, health, morals, comfort and general welfare of the people, and is paramount to any rights under contracts between individuals." *Manigault* v. *Springs,* 199 U. S. 473, 480. As Mr. Justice Holmes succinctly put the matter in his opinion for the Court in *Hudson Water Co.* v. *McCarter,* 209 U. S. 349, 357: "One whose rights, such as they are, are subject to state restriction, cannot remove them from the power of the State by making a contract

---

[11] Perhaps the best known of all Contract Clause cases of that era was *Dartmouth College* v. *Woodward,* 4 Wheat. 518.

[12] Indeed, at least one commentator has suggested that "the results might be the same if the contract clause were dropped out of the Constitution, and the challenged statutes all judged as reasonable or unreasonable deprivations of property." Hale, The Supreme Court and the Contract Clause: III, 57 Harv. L. Rev. 852, 890–891 (1944).

about them. The contract will carry with it the infirmity of the subject matter."

### B

If the Contract Clause is to retain any meaning at all, however, it must be understood to impose *some* limits upon the power of a State to abridge existing contractual relationships, even in the exercise of its otherwise legitimate police power. The existence and nature of those limits were clearly indicated in a series of cases in this Court arising from the efforts of the States to deal with the unprecedented emergencies brought on by the severe economic depression of the early 1930's.

In *Home Building & Loan Assn.* v. *Blaisdell,* 290 U. S. 398, the Court upheld against a Contract Clause attack a mortgage moratorium law that Minnesota had enacted to provide relief for homeowners threatened with foreclosure. Although the legislation conflicted directly with lenders' contractual foreclosure rights, the Court there acknowledged that, despite the Contract Clause, the States retain residual authority to enact laws "to safeguard the vital interests of [their] people." *Id.,* at 434. In upholding the state mortgage moratorium law, the Court found five factors significant. First, the state legislature had declared in the Act itself that an emergency need for the protection of homeowners existed. *Id.,* at 444. Second, the state law was enacted to protect a basic societal interest, not a favored group. *Id.,* at 445. Third, the relief was appropriately tailored to the emergency that it was designed to meet. *Ibid.* Fourth, the imposed conditions were reasonable. *Id.,* at 445–447. And, finally, the legislation was limited to the duration of the emergency. *Id.,* at 447.

The *Blaisdell* opinion thus clearly implied that if the Minnesota moratorium legislation had not possessed the characteristics attributed to it by the Court, it would have been invalid under the Contract Clause of the Constitution.[13]

---

[13] In *Veix* v. *Sixth Ward Building & Loan Assn.,* 310 U. S. 32, 38, the Court took into account still another consideration in upholding a state

These implications were given concrete force in three cases that followed closely in *Blaisdell*'s wake.

In *W. B. Worthen Co.* v. *Thomas*, 292 U. S. 426, the Court dealt with an Arkansas law that exempted the proceeds of a life insurance policy from collection by the beneficiary's judgment creditors. Stressing the retroactive effect of the state law, the Court held that it was invalid under the Contract Clause, since it was not precisely and reasonably designed to meet a grave temporary emergency in the interest of the general welfare. In *W. B. Worthen Co.* v. *Kavanaugh*, 295 U. S. 56, the Court was confronted with another Arkansas law that diluted the rights and remedies of mortgage bondholders. The Court held the law invalid under the Contract Clause. "Even when the public welfare is invoked as an excuse," Mr. Justice Cardozo wrote for the Court, the security of a mortgage cannot be cut down "without moderation or reason or in a spirit of oppression." *Id.,* at 60. And finally, in *Treigle* v. *Acme Homestead Assn.,* 297 U. S. 189, the Court held invalid under the Contract Clause a Louisiana law that modified the existing withdrawal rights of the members of a building and loan association. "Such an interference with the right of contract," said the Court, "cannot be justified by saying that in the public interest the operations of building associations may be controlled and regulated, or that in the same interest their charters may be amended." *Id.,* at 196.

The most recent Contract Clause case in this Court was *United States Trust Co.* v. *New Jersey,* 431 U. S. 1.[14] In

---

law against a Contract Clause attack: the petitioner had "purchased into an enterprise already regulated in the particular to which he now objects."

[14] See also *El Paso* v. *Simmons*, 379 U. S. 497. There the Court held that a Texas law shortening the time within which a defaulted land claim could be reinstated did not violate the Contract Clause. "We do not believe that it can seriously be contended that the buyer was substantially induced to enter into these contracts on the basis of a defeasible right to reinstatement . . . or that he interpreted that right to be of everlasting effect. At the time the contract was entered into the State's policy was to

that case the Court again recognized that although the absolute language of the Clause must leave room for "the 'essential attributes of sovereign power,' . . . necessarily reserved by the States to safeguard the welfare of their citizens," *id.*, at 21, that power has limits when its exercise effects substantial modifications of private contracts. Despite the customary deference courts give to state laws directed to social and economic problems, "[l]egislation adjusting the rights and responsibilities of contracting parties must be upon reasonable conditions and of a character appropriate to the public purpose justifying its adoption." *Id.*, at 22. Evaluating with particular scrutiny a modification of a contract to which the State itself was a party, the Court in that case held that legislative alteration of the rights and remedies of Port Authority bondholders violated the Contract Clause because the legislation was neither necessary nor reasonable.[15]

## III

In applying these principles to the present case, the first inquiry must be whether the state law has, in fact, operated as a substantial impairment of a contractual relationship.[16]

---

sell the land as quickly as possible . . . ." *Id.*, at 514. In sum, "[t]he measure taken . . . was a mild one indeed, hardly burdensome to the purchaser . . . but nonetheless an important one to the State's interest." *Id.*, at 516–517.

[15] The Court indicated that impairments of a State's own contracts would face more stringent examination under the Contract Clause than would laws regulating contractual relationships between private parties, 431 U. S., at 22–23, although it was careful to add that "private contracts are not subject to unlimited modification under the police power." *Id.*, at 22.

[16] The novel construction of the Contract Clause expressed in the dissenting opinion is wholly contrary to the decisions of this Court. The narrow view that the Clause forbids only state laws that diminish the duties of a contractual obligor and not laws that increase them, a view arguably suggested by *Satterlee* v. *Matthewson*, 2 Pet. 380, has since been expressly repudiated. *Detroit United R. Co.* v. *Michigan*, 242 U. S. 238;

The severity of the impairment measures the height of the hurdle the state legislation must clear. Minimal alteration of contractual obligations may end the inquiry at its first stage.[17] Severe impairment, on the other hand, will push the inquiry to a careful examination of the nature and purpose of the state legislation.

The severity of an impairment of contractual obligations can be measured by the factors that reflect the high value the Framers placed on the protection of private contracts. Contracts enable individuals to order their personal and business affairs according to their particular needs and interests. Once arranged, those rights and obligations are binding under the law, and the parties are entitled to rely on them.

Here, the company's contracts of employment with its employees included as a fringe benefit or additional form of compensation, the pension plan. The company's maximum obligation was to set aside each year an amount based on the plan's requirements for vesting. The plan satisfied the current federal income tax code and was subject to no other legislative requirements. And, of course, the company was free to amend or terminate the pension plan at any time. The company thus had no reason to anticipate that its employees'

---

*Georgia R. & Power Co.* v. *Decatur,* 262 U. S. 432. See also, *e. g.,* *Sherman* v. *Smith,* 1 Black 587; *Bernheimer* v. *Converse,* 206 U. S. 516, 530; *Henley* v. *Myers,* 215 U. S. 373; *National Surety Co.* v. *Architectural Decorating Co.,* 226 U. S. 276; *Columbia R., Gas & Electric Co.* v. *South Carolina,* 261 U. S. 236; *Stockholders of Peoples Banking Co.* v. *Sterling,* 300 U. S. 175. Moreover, in any bilateral contract the diminution of duties on one side effectively increases the duties on the other.

The even narrower view that the Clause is limited in its application to state laws relieving debtors of obligations to their creditors is, as the dissent recognizes, *post,* at 257 n. 5, completely at odds with this Court's decisions. See *Dartmouth College* v. *Woodward,* 4 Wheat. 518; *Wood* v. *Lovett,* 313 U. S. 362; *El Paso* v. *Simmons, supra.* See generally Hale, The Supreme Court and the Contract Clause, 57 Harv. L. Rev. 512, 514–516 (1944).

[17] See n. 14, *supra.*

pension rights could become vested except in accordance with the terms of the plan. It relied heavily, and reasonably, on this legitimate contractual expectation in calculating its annual contributions to the pension fund.

The effect of Minnesota's Private Pension Benefits Protection Act on this contractual obligation was severe. The company was required in 1974 to have made its contributions throughout the pre-1974 life of its plan as if employees' pension rights had vested after 10 years, instead of vesting in accord with the terms of the plan. Thus a basic term of the pension contract—one on which the company had relied for 10 years—was substantially modified. The result was that, although the company's past contributions were adequate when made, they were not adequate when computed under the 10-year statutory vesting requirement. The Act thus forced a current recalculation of the past 10 years' contributions based on the new, unanticipated 10-year vesting requirement.

Not only did the state law thus retroactively modify the compensation that the company had agreed to pay its employees from 1963 to 1974, but also it did so by changing the company's obligations in an area where the element of reliance was vital—the funding of a pension plan.[18] As the Court has recently recognized:

> "These [pension] plans, like other forms of insurance, depend on the accumulation of large sums to cover contingencies. The amounts set aside are determined by a painstaking assessment of the insurer's likely liability. Risks that the insurer foresees will be included in the

[18] In some situations the element of reliance may cut both ways. Here, the company had relied upon the funding obligation of the pension plan for more than a decade. There was no showing of reliance to the contrary by its employees. Indeed, Minnesota did not act to protect any employee reliance interest demonstrated on the record. Instead, it compelled the employer to exceed bargained-for expectations and nullified an express term of the pension plan.

calculation of liability, and the rates or contributions charged will reflect that calculation. The occurrence of major unforeseen contingencies, however, jeopardizes the insurer's solvency and, ultimately, the insureds' benefits. Drastic changes in the legal rules governing pension and insurance funds, like other unforeseen events, can have this effect." *Los Angeles Dept. of Water & Power* v. *Manhart,* 435 U. S. 702, 721.

Moreover, the retroactive state-imposed vesting requirement was applied only to those employers who terminated their pension plans or who, like the company, closed their Minnesota offices. The company was thus forced to make all the retroactive changes in its contractual obligations at one time. By simply proceeding to close its office in Minnesota, a move that had been planned before the passage of the Act, the company was assessed an immediate pension funding charge of approximately $185,000.

Thus, the statute in question here nullifies express terms of the company's contractual obligations and imposes a completely unexpected liability in potentially disabling amounts. There is not even any provision for gradual applicability or grace periods. Cf. the Employee Retirement Income Security Act of 1974 (ERISA), 29 U. S. C. §§ 1061 (b)(2), 1086 (b), and 1144 (1976 ed.). See n. 23, *infra.* Yet there is no showing in the record before us that this severe disruption of contractual expectations was necessary to meet an important general social problem. The presumption favoring "legislative judgment as to the necessity and reasonableness of a particular measure," *United States Trust Co.,* 431 U. S., at 23, simply cannot stand in this case.

The only indication of legislative intent in the record before us is to be found in a statement in the District Court's opinion:

"It seems clear that the problem of plant closure and pension plan termination was brought to the attention

of the Minnesota legislature when the Minneapolis-Moline Division of White Motor Corporation closed one of its Minnesota plants and attempted to terminate its pension plan." 449 F. Supp., at 651.[19]

But whether or not the legislation was aimed largely at a single employer,[20] it clearly has an extremely narrow focus. It applies only to private employers who have at least 100 employees, at least one of whom works in Minnesota, and who have established voluntary private pension plans, qualified under § 401 of the Internal Revenue Code. And it applies only when such an employer closes his Minnesota office or terminates his pension plan.[21] Thus, this law can

---

[19] The Minnesota Supreme Court, *Fleck* v. *Spannaus*, 312 Minn. 223, 251 N. W. 2d 334, engaged in mere speculation as to the state legislature's purpose.

[20] In *Malone* v. *White Motor Corp.*, 435 U. S., at 501 n. 5, the Court noted that the White Motor Corp., an employer of more than 1,000 Minnesota employees, had been prohibited from terminating its pension plan until the expiration date of its collective-bargaining agreement, May 1, 1974. *International Union, UAW* v. *White Motor Corp.*, 505 F. 2d 1193 (CA8). On April 9, 1974, the Minnesota Act was passed, to become effective the following day. When White Motor proceeded to terminate its collectively bargained pension plan at the earliest possible date, May 1, 1974, the State assessed a deficiency of more than $19 million, based upon the Act's 10-year vesting requirement.

[21] Not only did the Act have an extremely narrow aim, but also its effective life was extremely short. The United States House of Representatives had passed a version of the Employee Retirement Income Security Act of 1974, 29 U. S. C. § 1001 *et seq.* (1976 ed.), on February 28, 1974, 120 Cong. Rec. 4781–4782 (1974), and the Senate on March 4, 1974, *id.*, at 5011. Both versions expressly pre-empted state laws. That the Minnesota Legislature was aware of the impending federal legislation is reflected in the explicit provision of the Act that it will "become null and void upon the institution of a mandatory plan of termination insurance guaranteeing the payment of a substantial portion of an employee's vested pension benefits pursuant to any law of the United States." Minn. Stat. § 181B.17. ERISA itself, effective January 1, 1975, expressly pre-empts

hardly be characterized, like the law at issue in the *Blaisdell* case, as one enacted to protect a broad societal interest rather than a narrow class.[22]

Moreover, in at least one other important respect the Act does not resemble the mortgage moratorium legislation whose constitutionality was upheld in the *Blaisdell* case. This legislation, imposing a sudden, totally unanticipated, and substantial retroactive obligation upon the company to its employees,[23] was not enacted to deal with a situation remotely approaching the broad and desperate emergency economic conditions of the early 1930's—conditions of which the Court in *Blaisdell* took judicial notice.[24]

Entering a field it had never before sought to regulate, the Minnesota Legislature grossly distorted the company's existing contractual relationships with its employees by superimposing retroactive obligations upon the company substan-

---

all state laws regulating covered plans. 29 U. S. C. § 1144 (a) (1976 ed.). Thus, the Minnesota Act was in force less than nine months, from April 10, 1974, until January 1, 1975. The company argues that the enactment of the law while ERISA was on the horizon totally belies the State's need for this pension legislation.

[22] In upholding the constitutionality of the Act, the District Court referred to Minnesota's interest in protecting the economic welfare of its older citizens, as well as their surrounding economic communities. 449 F. Supp. 644.

[23] Compare the gradual applicability of ERISA, which itself is not even mandatory. At the outset ERISA did not go into effect at all until four months after it was enacted. 29 U. S. C. § 1144 (1976 ed.). Funding and vesting requirements were delayed for an additional year. §§ 1086 (b), 1061 (b) (2) (1976 ed.). By contrast, the Minnesota Act became fully effective the day after its passage. The District Court rejected out of hand the argument that employers were constitutionally entitled to some grace period to adjust their pension planning. 449 F. Supp., at 651.

[24] This is not to suggest that only an emergency of great magnitude can constitutionally justify a state law impairing the obligations of contracts. See, *e. g., Veix* v. *Sixth Ward Building & Loan Assn.,* 310 U. S., at 39–40; *East New York Savings Bank* v. *Hahn,* 326 U. S. 230; *El Paso* v. *Simmons,* 379 U. S. 497.

tially beyond the terms of its employment contracts. And that burden was imposed upon the company only because it closed its office in the State.

This Minnesota law simply does not possess the attributes of those state laws that in the past have survived challenge under the Contract Clause of the Constitution. The law was not even purportedly enacted to deal with a broad, generalized economic or social problem. Cf. *Home Building & Loan Assn.* v. *Blaisdell,* 290 U. S., at 445. It did not operate in an area already subject to state regulation at the time the company's contractual obligations were originally undertaken, but invaded an area never before subject to regulation by the State. Cf. *Veix* v. *Sixth Ward Building & Loan Assn.,* 310 U. S. 32, 38.[25] It did not effect simply a temporary alteration of the contractual relationships of those within its coverage, but worked a severe, permanent, and immediate change in those relationships—irrevocably and retroactively. Cf. *United States Trust Co.* v. *New Jersey,* 431 U. S., at 22. And its narrow aim was leveled, not at every Minnesota employer, not even at every Minnesota employer who left the State, but only at those who had in the past been sufficiently enlightened as voluntarily to agree to establish pension plans for their employees.

"Not Blaisdell's case, but Worthen's (*W. B. Worthen Co.* v. *Thomas,* [292 U. S. 426]) supplies the applicable rule" here. *W. B. Worthen Co.* v. *Kavanaugh,* 295 U. S., at 63. It is not necessary to hold that the Minnesota law impaired the obligation of the company's employment contracts "without moderation or reason or in a spirit of oppression." *Id.,* at 60.[26] But we do hold that if the Contract Clause means anything at

---

[25] See n. 13, *supra.*

[26] As Mr. Justice Cardozo's opinion for the Court in the *Kavanaugh* case made clear, these criteria are "the outermost limits only." The opinion went on to stress the state law's "studied indifference to the interests" of creditors. 295 U. S., at 60.

all, it means that Minnesota could not constitutionally do what it tried to do to the company in this case.

The judgment of the District Court is reversed.

*It is so ordered.*

MR. JUSTICE BLACKMUN took no part in the consideration or decision of this case.

MR. JUSTICE BRENNAN, with whom MR. JUSTICE WHITE and MR. JUSTICE MARSHALL join, dissenting.

In cases involving state legislation affecting private contracts, this Court's decisions over the past half century, consistently with both the constitutional text and its original understanding, have interpreted the Contract Clause as prohibiting state legislative Acts which, "[w]ith studied indifference to the interests of the [contracting party] or to his appropriate protection," effectively diminished or nullified the obligation due him under the terms of a contract. *W. B. Worthen Co.* v. *Kavanaugh,* 295 U. S. 56, 60 (1935). But the Contract Clause has not, during this period, been applied to state legislation that, while creating new duties, in nowise diminished the efficacy of any contractual obligation owed the constitutional claimant. Cf. *Goldblatt* v. *Hempstead,* 369 U. S. 590 (1962). The constitutionality of such legislation has, rather, been determined solely by reference to other provisions of the Constitution, *e. g.,* the Due Process Clause, insofar as they operate to protect existing economic values.

Today's decision greatly expands the reach of the Clause. The Minnesota Private Pension Benefits Protection Act (Act) does not abrogate or dilute any obligation due a party to a private contract; rather, like all positive social legislation, the Act imposes new, additional obligations on a particular class of persons. In my view, any constitutional infirmity in the law must therefore derive, not from the Contract Clause, but from the Due Process Clause of the Fourteenth Amendment.

I perceive nothing in the Act that works a denial of due process and therefore I dissent.

## I

I begin with an assessment of the operation and effect of the Minnesota statute. Although the Court disclaims knowledge of the purposes of the law, both the terms of the Act and the opinion of the State Supreme Court disclose that it was designed to remedy a serious social problem arising from the operation of private pension plans. As the Minnesota Supreme Court indicated, see *Fleck* v. *Spannaus,* 312 Minn. 223, 231, 251 N. W. 2d 334, 338 (1977), the impetus for the law must have been a legislative belief—shared by Congress, see generally Employee Retirement Income Security Act of 1974 (ERISA), 29 U. S. C. § 1001 *et seq.* (1976 ed.)—that private pension plans often were grossly unfair to covered employees. Not only would employers often neglect to furnish their employees with adequate information concerning their rights under the plans, leading to erroneous expectations, but also because employers often failed to make contributions to the pension funds large enough adequately to fund their plans, employees often ultimately received only a small amount of those benefits they reasonably anticipated. See *Fleck* v. *Spannaus, supra,* at 231, 251 N. W. 2d, at 338. Acting against this background, Minnesota, prior to the enactment of ERISA, adopted the Act to remedy, *inter alia,* what was viewed as a related serious social problem: the frustration of expectation interests that can occur when an employer closes a single plant and terminates the employees who work there.[1]

Pension plans normally do not make provision to protect

---

[1] Since appellant's plan remains in force at its other plants, this case does not involve a termination of a pension plan, and I will therefore not discuss the aspect of the statute that involves such contingencies except to observe that it, too, is a sensitive attempt to protect employees' expectation interests.

the interests of employees—even those within only a few months of the "vesting" of their rights under the plan—who are terminated because an employer closes one of his plants. See generally Bernstein, Employee Pension Rights When Plants Shut Down: Problems and Some Proposals, 76 Harv. L. Rev. 952 (1963). Even assuming—contrary to common experience—that an employer adequately informs his employees that a termination for any reason prior to vesting will result in forfeiture of accrued pension credits, denial of all pension benefits not because of job-related failings, but only because the employees are unfortunate enough to be employed at a plant that closes for purely economic reasons, is harsh indeed. For unlike discharges for inadequate job performance, which may reasonably be foreseen, the closing of a plant is a contingency outside the range of normal expectations of both the employer and the employee—as is made clear by the fact that Allied did not rely upon the possibility of a plant's closing in calculating the amount of its contributions to its pension plan fund.[2]

The Minnesota Act addresses this problem by selecting a period—10 years of employment—after which this generally unforeseen contingency may not be the basis for depriving employees of their accumulated pension fund credits, and by establishing a mechanism to provide the employees with the equivalent of the earned pension plan credits. Although the Court glides over this fact, it should be apparent that the Act will impose only minor economic burdens on employers whose pension plans have been adequately funded. For, where, as was true here and as will generally be true, the possibility of a plant's closing was not relied upon by actuaries in calculating the amount of the employer's contributions to the plan, an

---

[2] All parties to this case agree that Allied's actuarial assumptions in calculating its annual contributions to the pension plan did not include the possibility of a plant's closing.

adequate pension plan fund would include contributions on behalf of terminated employees of 10 or more years' service whose rights had not vested. Indeed, without the Act, the closing of the plant would create a windfall for the employer, because, due to the resulting surplus in the fund, his future contributions would be reduced. In denying the windfall, the Act requires that the employer use the money he will save in the future to purchase annuities for the terminated employees.[3] Of course, the consequence for the employer may be a slightly higher pension expense; the greater outlay might arise, in part, because the past contributions to the plan would have reflected the actuarial possibility that some of the employees who had served 10 years might not ultimately satisfy the plan's vesting requirement.

I emphasize, contrary to the repeated protestations of the Court, that the Act does not impose "sudden and unanticipated" burdens. The features of the Act involved in this case come into play only when an employer, after the effective date of the Act, closes a plant. The existence of the Act's duties— which are similar to a legislatively imposed requirement of

---

[3] Because appellant's pension plan was, at the time of the plant closing, underfunded by in excess of $295,000, appellant's pension-funding charge— which the parties stipulate will be between $114,000 and $195,000—will not in fact be offset by future out-of-pocket savings. But this is incidental. What is critical is that appellant, like all covered employers, will be forced to assume an economic burden only a little greater than that inherent in its original undertaking to set up a pension plan for the benefit of its employees.

Although the Court refers to the fact that, under the terms of the plan, no sanctions could be imposed on appellant for not adequately funding it, no substantial objection can be levied against the Act to the extent that it mandates funding sufficient to meet the employer's original undertaking. The plan in the present case can be interpreted as imposing a duty on the employer to fund it adequately, see App. to Brief for Appellant 10a (§ 10 of the plan), and the employees here surely would have understood it as imposing that requirement. There can be no serious objection to a measure that makes such a promise enforceable.

severance pay measured by the length of the discharged employees' service—is simply one of a number of factors that the employer considers in making the business decision whether to close a plant and terminate the employees who work there. In no sense, therefore, are the Act's requirements unanticipated. While the extent of the employer's obligation depends on pre-enactment conduct, the requirements are triggered solely by the closing of a plant subsequent to enactment.[4]

## II

The primary question in this case is whether the Contract Clause is violated by state legislation enacted to protect employees covered by a pension plan by requiring an employer to make outlays—which, although not in this case, will largely be offset against future savings—to provide terminated employees with the equivalent of benefits reasonably to be expected under the plan. The Act does not relieve either the employer or his employees of any existing contract obligation. Rather, the Act simply creates an additional, supplemental duty of the employer, no different in kind from myriad duties created by a wide variety of legislative measures which defeat settled expectations but which have nonetheless been sustained by this Court. See, e. g., Usery v. Turner Elkhorn Mining Co., 428 U. S. 1 (1976); Hadacheck v. Sebastian, 239 U. S. 394 (1915). For this reason, the Minnesota Act, in my view, does not implicate the Contract Clause in any way. The basic fallacy of today's decision is its mistaken view that the Contract Clause protects all contract-based expectations, including that of an employer that his obligations to his employees will not be legislatively enlarged beyond those explicitly provided in his pension plan.

---

[4] Although appellant here apparently decided to close its Minnesota plant prior to the Act's effective date, appellant had every opportunity to reconsider that decision after the Act was adopted and presumably reached its final decision after weighing the possible liabilities under the Act.

## A

Historically, it is crystal clear that the Contract Clause was not intended to embody a broad constitutional policy of protecting all reliance interests grounded in private contracts. It was made part of the Constitution to remedy a particular social evil—the state legislative practice of enacting laws to relieve individuals of their obligations under certain contracts—and thus was intended to prohibit States from adopting "as [their] policy the repudiation of debts or the destruction of contracts or the denial of means to enforce them," *Home Building & Loan Assn.* v. *Blaisdell*, 290 U. S. 398, 439 (1934). But the Framers never contemplated that the Clause would limit the legislative power of States to enact laws creating duties that might burden some individuals in order to benefit others.

The widespread dissatisfaction with the Articles of Confederation and, thus, the adoption of our Constitution, was largely a result of the mass of legislation enacted by various States during our earlier national period to relieve debtors from the obligation to perform contracts with their creditors. The economic depression that followed the Revolutionary War witnessed "an ignoble array of [such state] legislative schemes." *Id.*, at 427. Perhaps the most common of these were laws providing for the emission of paper currency, making it legal tender for the payment of debts. In addition, there were "installment laws," authorizing the payment of overdue obligations in several installments over a period of months or even years, rather than in a single lump sum as provided for in a contract; "stay laws," statutes staying or postponing the payment of private debts or temporarily closing the courts; and "commodity payment laws," permitting payments in certain enumerated commodities at a proportion, often three-fourths or four-fifths, of actual value. See *id.*, at 454–459 (Sutherland, J., dissenting); *Sturges* v. *Crowninshield,* 4 Wheat. 122, 204 (1819); see also B. Wright, The Contract Clause of the

Constitution 4 (1938); Hale, The Supreme Court and the Contract Clause, 57 Harv. L. Rev. 512–513 (1944).

Thus, the several provisions of Art. I, § 10, of the Constitution—"No State shall . . . coin Money; emit Bills of Credit; make any Thing but gold and silver Coin a Tender in Payment of Debts; [or] pass any . . . Law impairing the Obligation of Contracts . . . ."—were targeted directly at this wide variety of debtor relief measures. Although the debates in the Constitutional Convention and the subsequent public discussion of the Constitution are not particularly enlightening in determining the scope of the Clause, they support the view that the sole evil at which the Contract Clause was directed was the theretofore rampant state legislative interference with the ability of creditors to obtain the payment or security provided for by contract. The Framers regarded the Contract Clause as simply an adjunct to the currency provisions of Art. I, § 10, which operated primarily to bar legislation depriving creditors of the payment of the full value of their loans. See Wright, *supra,* at 5–16. The Clause was thus intended by the Framers to be applicable only to laws which altered the obligations of contracts by effectively relieving one party of the obligation to perform a contract duty.[5]

### B

The terms of the Contract Clause negate any basis for its interpretation as protecting all contract-based expectations from unjustifiable interference. It applies, as confirmed by consistent judicial interpretations, only to *state legislative* Acts. See generally *Tidal Oil Co.* v. *Flanagan,* 263 U. S. 444 (1924). Its inapplicability to impairments by state judicial acts or by national legislation belies interpretation of the Clause as

---

[5] Of course, as our recent decisions make plain, the applicability of the Clause has not been confined to classic "debtor relief" laws, but has been regarded as implicated by any measure which dilutes or nullifies a duty created by a contract. See, *e. g., El Paso* v. *Simmons,* 379 U. S. 497 (1965).

intended broadly to make all contract expectations inviolable. Rather, the only possible interpretation of its terms, especially in view of its history, is as a limited prohibition directed at a particular, narrow social evil, likely to occur only through state legislative action. This evil is identified with admirable precision: "Law[s] *impairing* the Obligation of Contracts." (Emphasis supplied.) It is nothing less than an abuse of the English language to interpret, as does the Court, the term "impairing" as including laws which create new duties. While such laws may be conceptualized as "enlarging" the obligation of a contract when they add to the burdens that had previously been imposed by a private agreement, such laws cannot be prohibited by the Clause because they do not dilute or nullify a duty a person had previously obligated himself to perform.

Early judicial interpretations of the Clause explicitly rejected the argument that the Clause applies to state legislative enactments that enlarge the obligations of contracts. *Satterlee* v. *Matthewson*, 2 Pet. 380 (1829), is the leading case. There, this Court rejected a claim that a state legislative Act which gave validity to a contract which the state court had held, before the enactment of the statute, to be invalid at common law could be said to have "impaired the obligation of a contract." It reasoned that "all would admit the retrospective character of [the particular state] enactment, and that the effect of it was to create a contract between parties where none had previously existed. But it surely cannot be contended, that to create a contract, and to destroy or impair one, mean the same thing." *Id.*, at 412–413.[6] Since *creating* an obligation where none had existed previously is not an *impairment* of contract, it of course should follow necessarily that

---

[6] *Satterlee*, which was written by Mr. Justice Washington, necessarily rejected the contrary dictum of *Green* v. *Biddle*, 8 Wheat. 1, 84 (1823), another of Mr. Justice Washington's Court opinions.

legislation increasing the obligation of an existing contract is not an impairment.[7]   See Hale, *supra,* at 514–516.

## C

The Court seems to attempt to justify its distortion of the meaning of the Contract Clause on the ground that imposing new duties on one party to a contract can upset his contract-based expectations as much as can laws that effectively relieve the other party of any duty to perform.   But it is no more anomalous to give effect to the term "impairment" and deny a claimant protection under the Contract Clause when new duties are created than it is to give effect to the Clause's inapplicability to acts of the National Government and deny a Contract Clause remedy when an Act of Congress denies a creditor the ability to enforce a contract right to payment. Both results are simply consequences of the fact that the Clause does not protect all contract-based expectations.

More fundamentally, the Court's distortion of the meaning of the Contract Clause creates anomalies of its own and threatens to undermine the jurisprudence of property rights developed over the last 40 years.   The Contract Clause, of course, is but one of several clauses in the Constitution that protect existing economic values from governmental interference.   The Fifth Amendment's command that "private property [shall not] be taken for public use, without just

---

[7] In *Georgia R. & Power Co.* v. *Decatur,* 262 U. S. 432 (1923), *Detroit United R. Co.* v. *Michigan,* 242 U. S. 238 (1916), and in dictum in other cases, see *ante,* at 244–245, n. 16, this Court embraced, without any careful analysis and without giving any consideration to *Satterlee* v. *Matthewson,* 2 Pet. 380 (1829), the contrary view that the impairment of a contract may consist in "adding to its burdens" as well as in diminishing its efficacy. *Georgia R. & Power Co.* v. *Decatur, supra,* at 439.   These opinions reflect the then-prevailing philosophy of economic due process which has since been repudiated.   See *Ferguson* v. *Skrupa,* 372 U. S. 726 (1936).   In my view, the reasoning of *Georgia R. & Power Co.* and *Detroit United R. Co.* is simply wrong.

compensation" is such a clause. A second is the Due Process Clause, which during the heyday of substantive due process, see *Lochner* v. *New York,* 198 U. S. 45 (1905), largely supplanted the Contract Clause in importance and operated as a potent limitation on government's ability to interfere with economic expectations. See G. Gunther, Cases and Materials on Constitutional Law 603–604 (9th ed. 1975); Hale, The Supreme Court and the Contract Clause: III, 57 Harv. L. Rev. 852, 890–891 (1944). Decisions over the past 50 years have developed a coherent, unified interpretation of all the constitutional provisions that may protect economic expectations and these decisions have recognized a broad latitude in States to effect even severe interference with existing economic values when reasonably necessary to promote the general welfare. See *Penn Central Transp. Co.* v. *New York City, ante,* p. 104; *Pittsburgh* v. *Alco Parking Corp.,* 417 U. S. 369 (1974); *Goldblatt* v. *Hempstead,* 369 U. S. 590 (1962); *Sproles* v. *Binford,* 286 U. S. 374 (1932); *Euclid* v. *Ambler Realty Co.,* 272 U. S. 365 (1926). At the same time the prohibition of the Contract Clause, consistently with its wording and historic purposes, has been limited in application to state laws that diluted, with utter indifference to the legitimate interests of the beneficiary of a contract duty, the existing contract obligation, *W. B. Worthen Co.* v. *Kavanaugh,* 295 U. S. 56 (1935); see *United States Trust Co.* v. *New Jersey,* 431 U. S. 1 (1977); cf. *El Paso* v. *Simmons,* 379 U. S. 497 (1965); *Home Building & Loan Assn.* v. *Blaisdell,* 290 U. S. 398 (1934).

Today's conversion of the Contract Clause into a limitation on the power of States to enact laws that impose duties additional to obligations assumed under private contracts must inevitably produce results difficult to square with any rational conception of a constitutional order. Under the Court's opinion, any law that may be characterized as "superimposing" new obligations on those provided for by contract is to be

regarded as creating "sudden, substantial, and unanticipated burdens" and then to be subjected to the most exacting scrutiny. The validity of such a law will turn upon whether judges see it as a law that deals with a generalized social problem, whether it is temporary (as few will be) or permanent, whether it operates in an area previously subject to regulation, and, finally, whether its duties apply to a broad class of persons. See *ante*, at 249–250. The necessary consequence of the extreme malleability of these rather vague criteria is to vest judges with broad subjective discretion to protect property interests that happen to appeal to them.[8]

To permit this level of scrutiny of laws that interfere with contract-based expectations is an anomaly. There is nothing sacrosanct about expectations rooted in contract that justify according them a constitutional immunity denied other property rights. Laws that interfere with settled expectations created by state property law (and which impose severe economic burdens) are uniformly held constitutional where reasonably related to the promotion of the general welfare. *Hadacheck* v. *Sebastian*, 239 U. S. 394 (1915) is illustrative. There a property owner had established on a particular parcel

---

[8] With respect, the Court's application of these criteria illustrates this point. First, I find it difficult to understand how the Court can assert that the Act's attempt to protect the expectation interests of employees to pension plans does not deal with a "broad, generalized . . . social problem" but that the mortgage moratorium in *Home Building & Loan Assn.* v. *Blaisdell*, 290 U. S. 398 (1934), did. The Court's suggestion that the Act has a "narrow aim" because it applies only to pension plans overlooks that it is the existence of the pension plan that creates the need for this legislation. Second, the assertion that Minnesota here "invaded an area never before subject to regulation" takes an exceedingly restrictive view of the subject matter of the Act. If it is regarded not as a private pension plan, but rather as the compensation afforded employees by large employers, then the statute operates in an area that has been extensively regulated. The only explanation for the Court's decision is that it subjectively values the interests of employers in pension plans more highly than it does the legitimate expectation interests of employees.

of land a perfectly lawful business of a brickyard, and, in reliance on the existing law, continued to operate that business for a number of years. However, a local ordinance was passed prohibiting the operation of brickyards in the particular locale and diminishing the value of the claimant's parcel and thus of his investment by nearly 90%. Notwithstanding the effect of the ordinance on the value of the investment, the ordinance was sustained against a taking claim. See also *Miller* v. *Schoene*, 276 U. S. 272 (1928) (statute required cutting down ornamental red cedar trees because they had cedar rust which would be harmful to apple trees in the vicinity).

There is no logical or rational basis for sustaining the duties created by the laws in *Miller* and *Hadacheck*, but invalidating the duty created by the Minnesota Act. Surely, the Act effects no greater interference with reasonable reliance interests than did these other laws. Moreover, the laws operate identically: They all create duties that burden one class of persons and benefit another. The only difference between the present case and *Hadacheck* or *Miller* is that here there was a prior contractual relationship between the members of the benefited and burdened classes. I simply cannot accept that this difference should possess constitutional significance. The only means of avoiding this anomaly is to construe the Contract Clause consistently with its terms and the original understanding and hold it is inapplicable to laws which create new duties.

### III

But my view that the Contract Clause has no applicability whatsoever to the Minnesota Act does not end the inquiry in this case. The Due Process Clause of the Fourteenth Amendment limits a State's power to enact such laws and I therefore address that related challenge to the Act's validity.[9] I think that any claim based on due process has no merit.

---

[9] I recognize that the only question presented by appellant is whether the Minnesota Act violates the Contract Clause. See Jurisdictional State-

My conclusion rests to a considerable extent upon *Usery* v. *Turner Elkhorn Mining Co.,* 428 U. S. 1 (1976). That case involved a federal statute that required the operators of coal mines to compensate employees who had contracted pneumoconiosis even though the employees had terminated their work in the coal-mining industry before the Act was passed. This federal statute imposed a new duty on operators based on past acts and applied even though the coal mine operators might not have known of the danger that their employees would contract pneumoconiosis at the time of the particular employees' service. *Id.,* at 17; see also *id.,* at 40 n. 4 (POWELL, J., concurring in part). While indicating that the Due Process Clause may place greater limitations on the Government's power to legislate retrospectively than it does on the Government's ability to act prospectively, the statute was upheld on the ground that Congress had broad discretion to deal with the serious social problem of pneumoconiosis affecting former miners and that it was "a rational measure to spread the costs of the employees' disabilities to those who have profited from the fruits of their labor—the operators and the coal consumers." *Id.,* at 18.

A similar analysis is appropriate here. The Act is an attempt to remedy a serious social problem: the utter frustration of an employee's expectations that can occur when he is terminated because his employer closes down his place of work. The burden on his employer is surely far less harsh than that saddled upon coal operators by the federal statute. Too, a large part of the employer's outlay that the Act requires will be offset against future savings. To this extent, the Act merely

ment 2. However, I think that a due process claim is fairly subsumed by the question presented and, under the circumstances, elementary fairness requires that I address the due process claim. This reasoning does not apply to the other possible challenges to the Act—*e. g.,* ones based on the "Taking" Clause or on the Commerce Clause—for these others involve rather different considerations from those involved in the Contract and Due Process Clause analyses.

prevents the employer from obtaining a windfall, an effect which would immunize this aspect of the statutory requirement from attack even under the more stringent standards the Court reads into the Contract Clause. See *El Paso* v. *Simmons,* 379 U. S., at 515 and cases cited. To the extent the Act does more than prevent a windfall, it is simply implementing a reasonable legislative judgment that the expectation interests of employees of more than 10 years' service in the receipt of a pension but who, as an actuarial matter, would not satisfy the vesting requirements of the pension plan, should not be frustrated by the generally unforeseen contingency of a plant's closing.

Significantly, also, the Minnesota Act, unlike the federal statute upheld in *Turner Elkhorn Mining,* is not wholly retrospective in its operation. The Act requires an outlay from an employer like appellant only if after the enactment date of the Act (thus when it may give full consideration to the economic consequences of its decision) the employer decides to close its plant.

Nor, finally, do I believe it relevant that the Act is limited in coverage to large employers. "In establishing a system of unemployment benefits the legislature is not bound to occupy the whole field. It may strike at the evil where it is most felt." *Carmichael* v. *Southern Coal & Coke Co.,* 301 U. S. 495, 519–520 (1937).

In sum, in my view, the Contract Clause has no applicability whatsoever to the Act, and because I conclude the Act is consistent with the only relevant constitutional restriction—the Due Process Clause—I would affirm the judgment of the District Court.