Hon. Robert R. Kiley Chairman, Metropolitan Transportation Authority
You have asked whether section 2976 of the Public Authorities Law, imposing a bond issuance charge upon the issuance of bonds by certain public authorities and public benefit corporations, is applicable to a series of bonds issued by the Triborough Bridge and Tunnel Authority ("TBTA") on June 21, 1989, and, if such section is applicable, whether such application is an impairment of the contractual rights of the TBTA's bondholders in violation of Article I, section 10 of the United States Constitution (the "Contract Clause"). Your letter advises that the bond issuance charge resulting from the TBTA's June 21, 1989 bond issue was $464,450 and that such amount was due on July 15, 1989. Your letter further states that the TBTA did not pay the bond issuance charge when due because your bond counsel advised that the application of section2976 of the Public Authorities Law to the TBTA's June 21, 1989 bond issue might violate statutory covenants made by the State of New York and, therefore, constitute an unconstitutional impairment of the contractual rights of the TBTA's bondholders. You have provided us with copies of the bond counsel's opinion letter dated June 21, 1989, and a supporting memorandum of your bond counsel dated April 10, 1989.
Chapter 62 of the Laws of 1989 was approved on April 19, 1989 as part of the 1989 New York State budget. Chapter 62 concerned fees and other charges in connection with certain State activities. Section 67 of chapter 62 (the "Cost Recovery Act") enacted a new title 10 of article 9 of the Public Authorities Law, consisting of new sections 2975, 2976 and 2977.
New section 2975 of the Public Authorities Law requires that public authorities and public benefit corporations created by or pursuant to New York State law, at least three of whose members are appointed by the Governor (such entities are referred to in the Cost Recovery Act as "public benefit corporations"), must reimburse New York State each year for an allocable share of governmental costs attributable to the provision of services by the State to public benefit corporations, calculated pursuant to a formula.
New section 2976 requires that, on or after June 1, 1989, each public benefit corporation that issues bonds, notes or other obligations must pay to the State a bond issuance charge which is equal to a percentage of the principal amount of the bonds issued. The applicable percentage ranges from .05 percent for principal amounts of $1,000,000 or less to .20 percent for principal amounts of more than $10,000,000. Section 2976 permits a public benefit corporation to enter into a contract with the director of the budget providing for the payment of a bond issuance charge in lieu of that required by section 2976. The statute provides that such contract may be entered into when the amount to be paid thereunder exceeds the bond issuance charge that would otherwise be due, but also indicates that other circumstances may allow the execution of such a contract.
New section 2977 provides that new sections 2975 and 2976 shall not be construed to, or implemented in such a manner as to, (a) require the application of monies pledged to the security of bonds, notes or other obligations in violation of applicable bond covenants, or (b) otherwise impair the rights of bondholders of the public benefit corporations subject to the annual assessments and the bond issuance charges. Finally, section 68 of chapter 62 of the Laws of 1989 contains a severability clause applicable to the Cost Recovery Act providing that if any part thereof is adjudged by any court to be invalid, such judgment shall be limited to the part of the Cost Recovery Act directly involved in the controversy giving rise to such judgment and shall not affect the remainder of the Cost Recovery Act.
The TBTA is a public benefit corporation created pursuant to sections 550-571 of the Public Authorities Law. Pursuant to section 552(1) of the Public Authorities Law, the chairman and members of the TBTA are the chairman and members of the Metropolitan Transportation Authority ("MTA"). The MTA and the TBTA each consist of a chairman and sixteen other members appointed by the Governor (Public Authorities Law, §1263[1][a]). Thus, the TBTA is a "public benefit corporation" subject to the Cost Recovery Act.
In section 563(1) of the Public Authorities Law, the State covenanted with the TBTA's bondholders that the State "will not limit or alter" the TBTA's rights to "establish and collect" revenues sufficient to maintain and operate the TBTA's facilities and to "fulfill the terms of any agreements made with the holders of the bonds", or in any way "impair the rights and remedies of the bondholders" until the bonds, together with all interest thereon, are fully met and discharged. In addition, in section 566-a of the Public Authorities Law, the State covenanted with the TBTA's bondholders that the TBTA bonds, income therefrom, and "all moneys, funds, tolls and other revenues pledged topay or secure the payment of such bonds, shall at all times be free from taxation . . ." (emphasis added).
On June 21, 1989, the TBTA issued $232,225,000 aggregate principal amount of its General Purpose Revenue Bonds, Series P (the "Series P Bonds"). The Series P Bonds were issued pursuant to the TBTA's 1980 Revenue Bond Resolution, adopted July 23, 1980, as amended (the "Resolution"). According to your bond counsel's opinion letter, the Series P Bonds were issued on a parity as to lien and security and sources for payment with $2,049,250,000 aggregate principal amount of previously issued and outstanding TBTA General Purpose Revenue Bonds.
In your letter, you maintained that, as applied to the Series P Bonds, the bond issuance charge of section 2976 of the Public Authorities Law authorized the State to take revenues pledged to the TBTA's bondholders and secured by the State's promise not to interfere with such revenue stream and divert such revenues to the State treasury to satisfy budget requirements. For such reason, you suggested that the bond issuance charge did not apply to the Series P Bonds by virtue of section 2977 of the Public Authorities Law. You also argued that the application of the bond issuance charge to the Series P Bonds would violate the State's covenants contained in the above-quoted sections of the Public Authorities Law.
Article I, section 10 of the United States Constitution provides, among other things, that "[n]o State shall . . . pass any . . . law impairing the obligation of contracts". We assume for purposes of this opinion that sections 563 and 566-a of the Public Authorities Law constitute a contract between the State and the TBTA's bondholders (see, generally,United States Trust Co. v New Jersey, 431 U.S. 1 [1977]).
The United States Supreme Court has concluded that the threshold inquiry in any Contract Clause case is whether the challenged legislation has operated as a substantial impairment of a contractual relationship (EnergyReserves Group, Inc. v Kansas Power Light Co., 459 U.S. 400, 411
[1983]; Allied Structural Steel Co. v Spannaus, 438 U.S. 234, 244
[1978]). A number of recent cases illustrate what constitutes a substantial impairment of a contractual obligation in the context of state or municipal bonds. In United States Trust Co. v New Jersey,supra, the Supreme Court invalidated the repeal of a statutory covenant that generally precluded the Port Authority of New York and New Jersey (and the states themselves) from applying any Port Authority revenues or reserves pledged to the Port Authority's bondholders for any railroad purposes other than self-supporting railroads whose annual net income exceeded their annual debt service requirements. Because the Port Authority's surplus revenues were pooled in a general reserve fund that was required to be maintained at specified levels and that was pledged as security to the Port Authority's bondholders, the repeal of the statutory covenant created a risk that funds pledged to the bondholders would be applied to finance the deficits of commuter railroad systems to be acquired by the Port Authority. The Supreme Court noted that the outright repeal of the statutory covenant authorized the Port Authority to assume greater deficits and thus diminish revenues and reserves pledged to the bondholders. According to the Supreme Court, repeal of the covenant totally eliminated an important security provision and thus impaired the obligation of the states' contract.
The New York Court of Appeals applied the analysis of United States TrustCo. in Patterson v Carey, 41 N.Y.2d 714 (1977). In that case, the State passed a law rescinding a parkway toll increase imposed by the Jones Beach State Parkway Authority and imposing a new outside review process for the approval of subsequent toll increases. The State had previously covenanted by statute with the Authority's bondholders that the Authority would be empowered to raise tolls, in its sole discretion, if toll revenues became insufficient to meet the Authority's debt service and operating expenses. The State also pledged not to limit or alter the rights vested in the Authority to the detriment of the bondholders. The Court of Appeals held that the statute, by rescinding the tolls and imposing a new outside review procedure for subsequent toll increases, impaired the State's covenants with the bondholders in violation of both the Federal Contract Clause and the Due Process Clause of the New York State Constitution (NY Const, Art I, § 6). The Court noted that since toll revenues were the sole source of funds for bond repayment, the statute granting the Authority the power to increase tolls was an important security provision. The covenant guaranteed the bondholders that the Authority would be able to raise tolls in order to pay its obligations. The Court observed that the intrusion by others outside the Authority was not what the bondholders bargained for when they purchased their bonds (Patterson v Carey, 41 N.Y.2d at 721-722).
In contrast to the cases analyzed above, no impairment of contract was found in Quirk v Municipal Assistance Corporation, 41 N.Y.2d 644 (1977). There, the Court of Appeals concluded that the State's diversion of the proceeds of the New York City sales and stock transfer taxes from the general revenues of the City to the Municipal Assistance Corporation did not result in any impairment of a contractual obligation to the City's bondholders. The Court rejected the plaintiff's contentions that the diversion of City revenues to MAC impaired the position of the bondholders because less tax revenue would be available for repayment of principal and interest on City bonds. The Court concluded that there was no impairment because the City was never obligated by law or by the bonds themselves to maintain sales tax or stock transfer tax revenues for the benefit of its bondholders. The City was obliged only to appropriate moneys for the repayment of City bonds and to exceed normal real estate tax limitations if necessary to raise the necessary monies. The Court stated that the bondholders' first lien on City revenues did not give the bondholders any right to insist that any particular taxes be maintained or new ones imposed to produce the necessary revenues (Quirk, supra, at 646-648).
In light of the foregoing, a demonstration that the payment of the bond issuance charge by the TBTA will result in the impairment of a contractual obligation is critical to your contention.
As your bond counsel's memorandum acknowledged, the Resolution must be reviewed to determine whether the TBTA is allowed to accumulate any funds that are not pledged to bondholders. The Resolution provides that TBTA revenues remaining after making required deposits to operating expense, debt service and reserve funds are placed in a general account. Funds in such general account are applied first to the debt service fund, then to the debt service reserve fund and then to the reserve account to meet any deficiencies in the amounts required to be maintained in such funds or account. To the extent not required to make up any deficiencies as described above, the Resolution provides that amounts in the general account as of the last business day of each month are "released and paid over to the [TBTA], free and clear of the lien and pledge of the Resolution". Such flow demonstrates that although TBTA revenues mayinitially be pledged to the bondholders, such revenues are ultimatelyreleased from the pledge of the Resolution and may be used by the TBTA for its corporate purposes without regard to any restrictions in favor of the bondholders.
The TBTA's financial statements reveal that, at the end of 1988, it had accumulated a large amount of unrestricted funds. The TBTA's official statement for the Series P Bonds contains the audited financial statements of the TBTA as of December 31, 1988. Such financial statements were prepared by Ernst Whinney. The TBTA balance sheet shows that on such date, the TBTA had unrestricted cash and investments of $76,325,000. Clearly this money may be applied to pay the bond issuance charge.
In summary, it appears that the TBTA has ample unrestricted funds with which to pay the bond issuance charge imposed upon it by the Cost Recovery Act. In such case, payment of such charge in no way impairs the obligations of the TBTA bondholders or violates the statutory covenants. Thus, the present case is distinguishable from United States Trust Co. vNew Jersey, 431 U.S. 1 (1977) and the other cases referred to in your letter and your bond counsel's opinion and memorandum. Here, the State has not repealed any of its statutory covenants. Moreover, the State has not violated the terms of any of its statutory covenants or impaired the TBTA's ability to raise the necessary revenues to comply with its own covenants. The State has not attempted to tax any pledged revenues. The Cost Recovery Act merely imposes a bond issuance charge on the TBTA which the TBTA is free to pay with unpledged or unrestricted funds. Thus, as in the situation in Quirk, supra, section 2976 of the Public Authorities Law does not require or cause the impairment, diminution or invasion of any revenues or funds pledged to bondholders. Therefore, section 2976 is not rendered inapplicable to the issuance of the Series P Bonds by virtue of section 2977, nor does the application of section 2976 to the Series P Bonds result in an impairment of a contractual obligation in violation of the Contract Clause. In view of the fact that the bond issuance charge can be paid from unrestricted funds, we need not consider whether or not the charge would rise to the level of a substantial
impairment of the contractual relationship sufficient to implicate federal or state constitutional concerns if such unrestricted funds were not available. Moreover, we do not address whether or not the TBTA has available to it alternative ways of satisfying this statutory obligation without violating constitutional guarantees. For the reasons described above, we have concluded that section 2976 of the Public Authorities Law is applicable to the Series P Bonds issued by the Triborough Bridge and Tunnel Authority and does not result in an unconstitutional impairment by the State of its contractual obligations. Accordingly, the Triborough Bridge and Tunnel Authority must pay the bond issuance charge in connection with the issuance of the Series P Bonds.