WHIRLPOOL CORPORATION and
Aetna Life Insurance Co.,
Appellees,

v.

Darlene RITTER, Naomi Ritter, Jamie
Ritter, Eric Ritter, and Joshua
Ritter, Appellants,

Diana Kay Shaw Ritter, Appellee.

No. 90–1998.

United States Court of Appeals,
Eighth Circuit.

Submitted Jan. 9, 1991.

Decided April 10, 1991.

Robert S. Blatt, Fort Smith, Ark., for appellants.

Ronald H. Lawson, Spiro, Okl., for appellees.

Before JOHN R. GIBSON and BOWMAN, Circuit Judges, and FLOYD R. GIBSON, Senior Circuit Judge.

FLOYD R. GIBSON, Senior Circuit Judge.

Darlene Ritter and her four children appeal the district court's determination that funds interpleaded by Whirlpool Corporation ("Whirlpool") and Aetna Life Insurance Company ("Aetna") should be paid to Diana Ritter. For the reasons detailed below, we reverse the district court's decision and remand for further proceedings.

## I. BACKGROUND

James and Darlene Ritter were married on April 2, 1972, and lived in Leflore County, Oklahoma. James was employed by Whirlpool in Fort Smith, Arkansas. On September 23, 1985, James enrolled in a group life insurance plan with Aetna Life Insurance Company ("Aetna") offered through Whirlpool. James designated Darlene as his beneficiary and did not designate a contingent beneficiary. In addition, his qualifying survivors would be entitled to certain income benefits[1] payable by Whirlpool in the event of James' death.

In 1987, the Oklahoma legislature passed a statute providing that if a "party to [a] contract with the power to designate the beneficiary of any death benefit dies after being divorced from the beneficiary named to receive such death benefit in the contract, all provisions in such contract in favor of the decedent's former spouse are thereby revoked." Okla.Stat. tit. 15, § 178(A) (Supp.1987). The statute further provides that "[i]n the event of either divorce or annulment, the decedent's former spouse shall be treated for all purposes

---

1. These extra benefits took two forms: unpaid wages earned by James prior to his death and a death benefit paid by Whirlpool.

under the contract as having predeceased the decedent." *Id.* Contracts covered by this provision include "life insurance contracts, annuities, retirement arrangements, compensation agreements and other contracts designating a beneficiary of any right, property or money in the form of a death benefit," *id.*, and the statue purports to apply to all such contracts of those persons "dying on or after November 1, 1987." *Id.* at § 178(D).[2]

On April 7, 1989, James and Darlene got divorced. The decree was entered in the District Court of Leflore County, and Darlene retained custody of the couple's four children. A clause in the decree enjoined James and Darlene "from marrying any other parties for a period of six months" after the decree was entered. Appellant's Appendix at 34. On April 28, 1989, James married Diana Kay Shaw in Crawford County, Arkansas. Diana had been divorced in Oklahoma on February 27, 1989; her divorce decree also forbade her from marrying any third party within six months of the decree. *Id.* at 56.

On July 9, 1989, James died of a gunshot wound to the head. The death certificate indicates that James was "shot by suspect," but the face of the certificate does not identify the suspect; however, it has been alleged that Darlene was the responsible party. *See Whirlpool Corp. v. Ritter*, No. 89–2233, slip op. at 16 (W.D.Ark. May 10, 1990); Respondent's Brief at 16–18.

Whirlpool and Aetna filed a diversity action in federal district court in Arkansas in the nature of an interpleader and paid the life insurance proceeds and other death benefits to the clerk of the district court. The district court determined that Arkansas' choice of law rule required that Oklahoma's recently-enacted statute be applied. The court further found that the statute applied to James' life insurance contract and it therefore prevented Darlene from receiving the money. The district court also determined that the marriage between James and Diana was not void under Oklahoma law; thus, as James' lawful wife, she was entitled to the interpleaded funds. Because of these determinations, the district court did not make a finding regarding Darlene's involvement in James' death. Darlene appeals, raising a variety of arguments at every stage of the district court's analysis. Diana, in defending the district court's judgment, offers a variety of alternate theories in support of its decision. Only those arguments necessary to our decision are addressed below.

## II. ANALYSIS

### A. Arkansas' Choice of Law Rule Applies

■ Darlene contends that because the plaintiffs in this case are merely stakeholders and do not seek an interest in that stake, and because the claimants are all from Oklahoma, Oklahoma's choice of law rule should be applied. We disagree.

■■ Whirlpool and Aetna, in pleading their case in district court, contended that federal jurisdiction existed because the plaintiffs and defendants were citizens of diverse states and more than $50,000 was in controversy. Appellant's Appendix at 4. This pleading thus invoked jurisdiction pursuant to 28 U.S.C. § 1332 (1988) (general diversity of citizenship). Federal district courts must apply the choice of law rules of the state in which they sit when jurisdiction is based on diversity of citizenship. *Klaxon Co. v. Stentor Elec. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021–22, 85 L.Ed. 1477 (1941). Even if this suit had been filed pursuant to 28 U.S.C. § 1335 (1988) (interpleader jurisdiction),[3] Arkansas' choice of law rules would be applied because the federal interpleader statute is

---

**2.** We note that this section of the statute was amended in 1989 and now reads thusly: "This section shall apply to any contract of a decedent made and entered into on or after November 1, 1987." Okla.Stat. tit. 15, § 178(D) (Supp.1989). This amendment did not go into effect until November 1, 1989, and does not apply to this suit.

**3.** Jurisdiction under the federal statute providing for interpleader was lacking in this case because all the claimants are citizens of Oklahoma. *See* 28 U.S.C. § 1335(a)(1) (1988).

merely a special brand of diversity jurisdiction. *Griffin v. McCoach*, 313 U.S. 498, 503, 61 S.Ct. 1023, 1025–26, 85 L.Ed. 1481 (1941) (applying *Klaxon* to suits brought under the federal interpleader statute); *see also Williams v. McFerrin*, 242 F.2d 53, 55 (5th Cir.1957). Though the Supreme Court has not decided a case presenting the precise procedural posture present in this case, we believe that the same outcome must attain in order to ensure that "the accident of diversity of citizenship [does not] constantly disturb equal administration of justice in coordinate state and federal courts sitting side by side." *Klaxon*, 313 U.S. at 496, 61 S.Ct. at 1021. No court has suggested that the selection of a choice of law rule in an interpleader action should differ depending upon whether the stakeholder asserts an interest in the stake, and we conclude that to so hold would violate the teachings of *Klaxon* and *Griffin*.

B.  Arkansas' Choice of Law Rule Dictates that Oklahoma Law be Applied

■ The appellants, relying on *Wallis v. Mrs. Smith's Pie Co.*, 261 Ark. 622, 550 S.W.2d 453 (1977), contend that Arkansas utilizes Professor Leflar's five choice-influencing factors as its choice of law rule. We do not believe that *Wallis* applies in actions of a contractual nature. *Wallis* involved an action sounding in tort, not in contract. Furthermore, on several occasions the Arkansas Supreme Court has discussed choice of law issues in actions *ex contractu* and has not relied on *Wallis* in making these decisions. *E.g., Tri–State Equip. Co. v. Tedder*, 272 Ark. 408, 614 S.W.2d 938 (1981); *Standard Leasing Corp v. Schmidt Aviation*, 264 Ark. 851, 576 S.W.2d 181 (1979). Had the Arkansas Supreme Court wished to replace the traditional choice of law rules in contract actions with Professor Leflar's test, we

would expect it to have done so explicitly as it did for tort actions in *Wallis.*

■ In actions *ex contractu*, Arkansas courts traditionally considered three different bases for making choice of law determinations: "the law of the state in which the contract was made; the law of the state where the contract is performed; and the law of the state which the parties intend to govern the contract, provided that state has a substantial connection with the contract." *Tiffany Indus. v. Commercial Grain Bin Co.*, 714 F.2d 799, 801 (8th Cir.1983) (per curiam) (citing *Cooper v. Cherokee Village Dev. Co.*, 236 Ark. 37, 43, 364 S.W.2d 158, 161 (1963)). More recently, however, Arkansas courts have begun applying the "significant contacts" test. *Id.* (citing *Standard Leasing*, 264 Ark. at 855–56, 576 S.W.2d at 184); *Bell v. Kansas City Fire & Marine Ins. Co.*, 616 F.Supp. 1305, 1307 (W.D.Ark.1985) (citations omitted). This test requires an examination of "the nature and quantity of each state's 'contacts' with the transaction at issue." *Snow v. Admiral Ins. Co.*, 612 F.Supp. 206, 209 (W.D.Ark.1985).

The district court properly determined that Oklahoma has the more significant contacts with the substance of this case. Arkansas' primary contacts are that James Ritter worked in Arkansas and the contract was issued pursuant to his employment. On the other hand, James and all the claimants lived in Oklahoma during the time period relevant to this case, and all of the claimants continue to live in Oklahoma. Oklahoma's contacts thus appear to be at least as numerous as Arkansas', and are certainly qualitatively superior to Arkansas' in light of the overriding issue in this case; that is, which of these competing Oklahoma citizens is to receive the money at issue? We thus agree with the district court's conclusion that Oklahoma law will govern this case.[4]

---

4.  We have previously held that we must defer to the district court's application of the choice of law rule of the state in which it sits. *E.g., Tiffany Indus.*, 714 F.2d at 802. However, after oral argument in this case, the Supreme Court decided *Salve Regina College v. Russell*, — U.S. —, 111 S.Ct. 1217, 113 L.Ed.2d 190 (1991) and determined that "a court of appeals should re-

view de novo a district court's determination of state law." *Id.* — U.S. at —, 111 S.Ct. at 1221. The rule of deference that we would have ordinarily applied originated from our rule that "we give great weight to the district court's construction of state law in diversity cases," *Tiffany Indus.*, 714 F.2d at 802, but now cannot be sustained in light of *Russell.* We make clear

C. Constitutionality of Applying Oklahoma's Statute to Insurance Contracts Entered Before the Statute was Effective

██ Darlene contends that the application of the statute to pre-existing contracts impairs obligations of contracts in violation of the Constitution. *See* U.S. Const. art I, § 10, cl. 1. We agree that such retrospective application is unconstitutional.

Our analysis under the contract clause must begin by ascertaining whether a contractual obligation has been substantially impaired. *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 244, 98 S.Ct. 2716, 2722, 57 L.Ed.2d 727 (1978). "Minimal alteration of contractual obligations may end the inquiry at its first stage. Severe impairment, on the other hand, will push the inquiry to a careful examination of the nature and purpose of the state legislation." *Id.* at 245, 98 S.Ct. at 2723 (footnote omitted). In determining the degree to which an obligation has been impaired, we must be mindful that the contracts clause is designed to "enable individuals to order their personal and business affairs according to their particular needs and interests. Once arranged, those rights and obligations are binding under the law, and the parties are entitled to rely on them." *Id.* The obligations protected by the clause "include[ ] not only the express terms [of the contract] but also the contemporaneous state law pertaining to interpretation and enforcement." *United States Trust Co. v. New Jersey*, 431 U.S. 1, 19–20 n. 17, 97 S.Ct. 1505, 1516 n. 17, 52 L.Ed.2d 92 (1977).

The parties agree that at the time James designated Darlene as his beneficiary, Oklahoma law provided that she would remain the beneficiary unless and until he designated someone else; thus, when James attempted to order his personal affairs, this rule of insurance contract construction became a part of the insurance contract's obligations. James was entitled to expect that his wishes regarding the insurance proceeds, as ascertained pursuant to this then-existing law, would be effectuated. By reaching back in time and disrupting this expectation, the Oklahoma legislature impaired James' contract.

This impairment is not insignificant; one of the primary purposes of a life insurance contract is to provide for the financial needs of a person (or persons) designated by the insured. When the Oklahoma legislature changed the rules for interpreting insurance contracts and applied the new rules to completed transactions, it effected a fundamental and pejorative change in the very essence of those contracts.

Determining that the retrospective application of this law substantially impairs contracts does not end our inquiry. The contract clause is not an absolute prohibition on the states' ability to pass legislation; however, it still "must be understood to impose *some* limits upon the power of a State to abridge existing contractual relationships, even in the exercise of its otherwise legitimate police power." *Spannaus*, 438 U.S. at 242, 98 S.Ct. at 2721 (emphasis in original). Consequently, we must determine whether this alteration of contractual obligations is designed to solve a general social or economic problem and whether it does so in a manner that is both reasonable and appropriate. *Id.* at 244, 98 S.Ct. at 2722.

The purpose of statutes similar to the one at issue is readily apparent; these statutes

> anticipate that, upon undergoing a fundamental change in family composition such as marriage, divorce or birth of a child, [insureds] would most likely intend *to provide for their new family members,* and/or revoke prior provisions made for their ex-spouses. The statutes also anticipate that [insureds] will often fail to *so provide and revoke,* not out of conscious intent, but simply from a lack of attentiveness.

*Coughlin v. Board of Admin.*, 152 Cal. App.3d 70, 73, 199 Cal.Rptr. 286, 287–88 (1984). These purposes certainly resemble

---

that we have accorded no deference to the district court's decision that Oklahoma law applied to this case.

general social concerns. However, it is not enough to say that the Oklahoma legislature had a purpose that was beneficial to the welfare of its citizens; the fact remains that the legislature's chosen method effects direct and fundamental changes to pre-existing contracts, as opposed to merely tangential effects on such agreements. The Supreme Court has recognized the difference between laws "limited in effect to contractual obligations or remedies" and those that "advance 'a broad societal interest,'" *Exxon Corp. v. Eagerton*, 462 U.S. 176, 191, 103 S.Ct. 2296, 2306, 76 L.Ed.2d 497 (1983) (quoting *Spannaus*, 438 U.S. at 249, 98 S.Ct. at 2724). Because the law at issue here directly alters the obligations and expectations of the contracting parties, it is not merely general, social legislation; consequently, we must examine the law to determine whether it is "'reasonable ... and of a character appropriate to the public purpose justifying its adoption.'" *Spannaus*, 438 U.S. at 244, 98 S.Ct. at 2722 (quoting *United States Trust Co*, 431 U.S. at 22, 97 S.Ct. at 1518).

The Oklahoma law, insofar as it is applied retrospectively, is inappropriate in light of its intended purpose and underlying rationale. While it may be true that some individuals, given a choice, would prefer to guaranty the financial security of their new family instead of their former family, this is certainly not a universal truth. It is plausible that James was primarily concerned about the economic well-being of his ex-wife because she had custody of his four minor children and he wanted to insure her ability to provide for their welfare. Thus, while it may be true that had James thought about his life insurance policy he would have changed it to name Diana as the beneficiary, it is equally possible that he made a conscious choice to leave Darlene as the named beneficiary.

In sum, this statute will either effectuate or frustrate his intent. James' familial situation is hardly unique, and with regard to every individual in his position, there is a real possibility that the insured consciously decided not to change the named beneficiary. These individuals are entitled to rely on the law governing insurance contracts as it existed when the contracts were made, and by radically altering the meaning of these contracts, the statute is unconstitutional. *Cf. Minnesota Ass'n of Health Care v. Minnesota Dep't of Pub. Welfare*, 742 F.2d 442, 451 (8th Cir.1984) ("This statute goes too far because it disrupts settled and completed financial arrangements made in reliance on existing law."), *cert. denied*, 469 U.S. 1215, 105 S.Ct. 1191, 84 L.Ed.2d 337 (1985).[5]

It is true that the law permitted James to "rename" Darlene his beneficiary if he so chose. Okla.Stat. tit. 15, § 178(B)(6) (Supp. 1987). This fact does not cure the constitutional infirmity; rather, it augments our belief that the infirmity exists. The legislature, in passing this statute, determined that people fail to consider the need to change their insurance policies after experiencing a change in family relations. We do not quarrel with this conclusion. However, this same conclusion suggests that an individual could rely on the pre-existing law and neither know nor expect that the rules governing his policy have changed, and thus might fail to consider the need to investigate potential changes in the law. Having determined that some individuals are inattentive regarding their insurance policies, the Oklahoma legislature can hardly expect these same individuals to be cognizant of changes in the law respecting those policies. Given the avowed purpose of this law, it is inappropriate and unreasonable for the legislature to apply it to pre-existing contracts.[6]

**5.** These same concerns have been articulated by the Oklahoma courts; in fact, the Oklahoma Court of Appeals recently determined that the retrospective application of this statute violates the Oklahoma Constitution. *Warrick v. Wolfe*, No. 72,605 (Okla.Ct.App. Feb. 5, 1991). Pursuant to Oklahoma law, *Warrick* lacks precedential value until the Oklahoma Supreme Court approves its publication, Okla.Stat. tit. 20,

§ 30.5 (Supp.1989). This approval has not yet been (and may never be) granted. We do not rely on *Warrick* in making our decision; we merely note the existence of this same controversy in the Oklahoma courts.

**6.** We do not address the constitutionality of the statute as it is applied prospectively, as this is not the issue presented by this appeal. How-

### D. Issues on Remand

Diana contends that the Oklahoma Supreme Court has held that "the beneficiary of a policy of life insurance who feloniously takes or causes to be taken the life of the [in]sured is barred from collecting the insurance money." Respondent's Brief at 16–17 (citing *State Mut. Life Assurance Co. of Am. v. Hampton*, 696 P.2d 1027 (Okla.1985)). However, the district court's memorandum opinion expressly states that the court's holding "ma[de] unnecessary any decision on Darlene Ritter's involvement in [J]ames Ritter's death." *Whirlpool Corp.*, No. 89–2233, slip op. at 16 (W.D.Ark. May 10, 1990). This court, despite the urgings of respondent's counsel, cannot properly make findings of fact on this matter. Thus, we remand this case to the district court to make findings of fact and conclusions of law regarding Darlene's involvement in James' death. Of course, if the court determines that Darlene is not entitled to the proceeds, it should determine who is so entitled.

Additionally, the district court should redetermine who is entitled to James' unpaid wages and death benefits. The district court's order, relying on its memorandum opinion, ordered that these funds be paid to Diana. Appellant's Appendix at 127. However, the memorandum opinion makes no mention of these funds, and does not reveal why these funds were ordered paid to Diana. Because of the breadth of Oklahoma's statute, it may be that the district court disposed of these funds pursuant to the same legal analysis it used for the disposition of the insurance proceeds. On the other hand, there may have been some other rationale. We direct the district court to explain its rationale regarding these funds.[7]

### III. CONCLUSION

Oklahoma law governs this dispute because Oklahoma has a more significant relationship to this matter than does Arkansas. However, Okla.Stat. tit. 15, § 178 is an unconstitutional impairment of contracts insofar as it is applied to insurance contracts entered before the statute became effective. Consequently, the case must be remanded for further findings of fact regarding Darlene's involvement in James' death and other proceedings consistent with this opinion.

ever, we note that, for purposes of the contracts clause, there is a profound difference between changing the law directly governing contracts yet to be made and changing the law directly governing contracts that have already been made. In the former case, the parties can be expected to incorporate the changes into their planning and negotiating, whereas in the latter case the parties expect their bargain to be protected in accordance with the law existing at the time of their agreement. *See United States Trust*, 431 U.S. at 19–20 n. 17, 97 S.Ct., at 1516 n. 17.

7. Because of our holding, we express no opinion on the validity of the marriage between James and Diana. We recognize that there is a risk of piecemeal appeals in this case, depending upon the district court's determinations regarding the unpaid wages and the death benefits. However, it would be inappropriate to discuss Oklahoma's law on this matter when such a discussion may not be necessary to the disposition of the case.