**In re SOUTHEAST ARKANSAS LANDFILL, INC.**

**SOUTHEAST ARKANSAS LANDFILL, INC., Plaintiff,**

**v.**

**STATE OF ARKANSAS by the ARKANSAS DEPARTMENT OF POLLUTION CONTROL AND ECOLOGY, Defendant.**

**Bankruptcy No. 90–50402.**

United States District Court, E.D. Arkansas, Pine Bluff Division.

Jan. 24, 1992.

Geoffrey Treece, Little Rock, for plaintiff.

Steve Weaver, Little Rock, for defendant.

Charles Gibson, Dermott, U.S. Trustee.

### ORDER

STEPHEN M. REASONER, Chief Judge.

Before the Court for consideration is the "Memorandum Findings of Fact, Conclu-

sions of Law and Order Certifying to the U.S. District Court for Disposition Pursuant to 28 U.S.C. § 157(c)(1)" from the Bankruptcy Court [1] in this matter. Having reviewed the Memorandum Findings of Fact, Conclusions of Law and Order of the bankruptcy judge, the objections and the transcript of proceedings carefully, and considered the matter *de novo* as this court is required to do under Rule 9033(d) of the Bankruptcy Rules, the Court concludes that the Findings and Conclusions should be adopted and judgement should be entered in favor of defendant State of Arkansas.

▆ This Court would note that there are situations where, under the guise of land use regulation, an actual taking occurs for which a land owner is entitled to compensation as in an eminent domain proceeding. Indeed, that issue may be defined more clearly by the Supreme Court during this term.[2] However, this Court is convinced, given the purpose of the statute, its enforcement and the amount of burden on the landowner in this case, that such a taking did not occur here.

It is so ORDERED.

MEMORANDUM FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER CERTIFYING TO THE U.S. DISTRICT COURT FOR DISPOSITION PURSUANT TO 28 U.S.C. § 157(c)(1)

MARY D. SCOTT, Bankruptcy Judge.

Southeast Arkansas Landfill, Inc. ("SEAL") filed a voluntary petition under Chapter 11 of the Bankruptcy Code on October 18, 1990. SEAL is a solid waste disposal facility, better known as a privately owned landfill for non-hazardous municipal garbage. At the time of the filing, the corporation had debts totaling some $73,923.63 and assets of an undetermined amount, although greater than $22,000. The debtor remains in possession of the estate.

SEAL filed the instant adversary proceeding on October 19, 1990, i.e., the day

---

1. The Honorable Mary Davies Scott, Bankruptcy Judge.

2. *See Lucas v. South Carolina Coastal Council,* 404 S.E.2d 895 (S.C.1991), *cert. granted,* — U.S. ——, 112 S.Ct. 436, 116 L.Ed.2d 455 (1991).

after it filed for Chapter 11 protection. The complaint seeks declaratory and injunctive relief against the Arkansas State Department of Pollution Control and Ecology ("ADPC & E" or "the Department"). Specifically, SEAL asks the Court to enjoin the Department from revoking SEAL's permit to accept municipal solid waste and to enjoin enforcement of certain Arkansas State laws.

SEAL is the assignee of a contract to dispose of out-of-state municipal solid waste. The "Waste Disposal Agreement" or the "Davenport Contract" between Davenport Industries, Inc. ("Davenport") of New Bridge Centers, Kingston, Pennsylvania and SEAL as the assignees of Arkansas County Waste, Inc. of Dewitt, Arkansas, provides for the delivery of up to 5,000 tons of waste per day to SEAL. The contract was to begin on or about August 1, 1989 and to continue for three years.

The complaint alleges that two Arkansas laws, Act 870 of 1989 and Act 319 of 1991, prohibit the importation of out-of-state solid waste into the State of Arkansas for disposal in the SEAL facility. SEAL claims the Acts are unreasonable restraints on interstate commerce. SEAL also alleges that the Acts impermissibly impair its contract with Davenport. SEAL also claims that the Department's enforcement of the Acts constitutes an inverse taking of its property without just compensation. Finally, SEAL claims that the Department's implementation of the Acts is a violation of SEAL's right to due process and equal protection under the law.[1] As a consequence, SEAL claims that it cannot profitably operate its landfill.

The parties tried the case to the Court on July 31 and August 1, 1991. Geoffrey Treece, Esq., and Charles S. Gibson, Esq., appeared for the debtor. Steve Weaver, Esq. appeared for the defendant. The parties filed post-trial briefs on September 9, 1991. The Court has had the case under advisement since that date.

## I. JURISDICTION AND STANDING

■ This is an adversary proceeding within the jurisdiction of the bankruptcy court. This proceeding is related to a case under the bankruptcy code although it is not a core proceeding. 28 U.S.C. §§ 157(b) and (c). The Eighth Circuit set out the standard for determining whether a proceeding is "related to" a bankruptcy case in *re: Dogpatch U.S.A., Inc.*, 810 F.2d 782 (8th Cir.1987). The Eighth Circuit there stated:

> [T]he test for determining whether a civil proceeding is related to bankruptcy is whether *the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy....* An action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action ... and which in any way impacts upon the handling and administration of the bankrupt estate.

*Dogpatch,* 810 F.2d at 786 (citations and internal quotations omitted); *see also, National City Bank v. Coopers and Lybrand,* 802 F.2d 990, 994 (8th Cir.1986).

The proceeding is properly before the Court because the outcome will have an effect on the estate. The debtor seeks injunctive and declaratory relief against the Arkansas Department of Pollution Control and Environment. The relief, if granted, would alter the debtor's rights, options, and freedom of action. An injunction would permit the debtor to go forward with certain waste disposal contracts and to continue, in effect, as a going concern pending the outcome of the Chapter 11 petition. Without relief, the applicable laws substantially impair the value of the debtor's estate.

The Bankruptcy Court confines itself to submitting proposed findings of fact and conclusions of law to the District Court. 28 U.S.C. § 157(c)(1). The parties have not consented expressly to the entry of final

---

1. SEAL also claimed that the Acts tend to foster and encourage monopolistic and unfair trade practices by SEAL's competitors. SEAL failed to include this claim in its pre-trial and post-trial briefs. SEAL did not put on any proof of this claim. The Court concludes that this claim should be dismissed for want of prosecution.

orders or judgment by the Bankruptcy Court. *See,* Fed.R.Bankr.P. 7008, 7012. Accordingly, the District Court has the power to enter a final order or judgment after a *de novo* review of those matters to which any party timely and specifically objects. 28 U.S.C. § 157(c)(1).

■ The Court further concludes that the debtor has standing to assert its claim in this Court. As discussed more fully below, the debtor's principal claim concerns a contract that may not have any value to the estate. However, the debtor also seeks prospective relief to permit it to accept solid waste from *any* source in order that it might reorganize under Chapter 11. The evidence in the case demonstrated that there is a lack of available landfill space in the State of Arkansas and that the SEAL facility is an available and potentially suitable site for the disposal of a large volume of solid waste. Therefore the Court concludes that the laws and regulations at issue cause substantial "injury in fact" to SEAL, which is sufficient for purposes of determining its standing. The Court makes this determination without considering whether or not a large contract for the disposal of waste in the landfill, discussed below, has any value to the estate.

## II. DISCUSSION

### A. INTERSTATE COMMERCE CLAUSE

The Court concludes that the defendant has not violated the Interstate Commerce Clause, U.S. Const. art. I, § 8, cl. 3. SEAL claims that Act 319 is a "per se" violation of the Commerce Clause because it constitutes "economic protection." SEAL also claims that the Act is invalid as applied because, even if the Act is valid on its face, the legislature could have used a less intrusive means to achieve the same ends. The department refutes both claims.

#### 1. *Background to Act 319.*

■ The State of Arkansas first created regional solid waste planning districts in 1989. Act 870 of 1989; Ark.Code Ann. § 8–6–701, *et seq.* ("Regional Solid Waste Planning Act of 1989" or "1989 Act"). The

purpose of the 1989 Act was, *inter alia,* to "protect the public health and the State's environmental quality by requiring regional solid waste planning." Ark.Code Ann. § 8–6–701. The 1989 Act separated the State into eight regions and restricted the flow of solid waste *into* each region from any source outside of the region. The 1989 Act also mandated a study of solid waste disposal needs in the State, established planning boards, and imposed a moratorium on the expansion of any landfill service area for two years.

The Court limits its discussion of the 1989 Act because its application to the instant case is moot. Plaintiff's original complaint claimed that the moratorium and import-into-district limitations of the 1989 Act were the causes of its financial problems. Since plaintiff filed the complaint, the 1989 Act moratorium expired by its own terms. Act 319 of 1991 supplements and updates the 1989 Act. As discussed more fully below, Act 319 imposes its own limitations on the importation of solid waste into any of the solid-waste management districts. Plaintiff subsequently amended its complaint to include Act 319.

The purpose of Act 319 is stated in the Act itself. The Court sets out the purpose in full because it is critical to understanding the issues in this case:

As directed by Act 870 of 1989, the Arkansas Solid Waste Fact Finding Task Force has presented its findings and proposals. The Task Force Report identifies serious and chronic deficiencies in how solid waste is managed in this state [sic]. The report is accompanied by legislative proposals which reaffirm the State's commitment to regional solid waste management embodied in Act 870, and aim, through extensive revision of current law, to make regionalization a reality. The report and the Task Force's legislative proposals demonstrate that the State does not have sufficient understanding or control of the overall solid waste stream to realize its goal of regional solid waste management, much less a responsible recycling and source reduction program. These goals cannot

be attained if the waste streams assigned to the respective regional planning districts continue to change during the crucial planning and development stages.

*Federal law has placed the burden of implementing regional solid waste management strategies upon the states, 42 U.S.C. § 6941 et seq. To this end, the Arkansas General Assembly has embarked upon the difficult task of addressing the complex solid waste needs of the State on a regional basis.* After giving due regard to all of the contingencies and exigencies inherent in planning a regional solid waste strategy, and after accommodating existing business expectations based upon waste streams originating from outside the Act 870 solid waste planning districts, the General Assembly hereby enacts the following emergency measure as an essential component of its efforts to reform solid waste management in Arkansas....

Act 319, § 2, Plaintiff's Ex. 24 (emphasis added). Act 319, unlike Act 870, the 1989 Act, explicitly refers to Federal Law. The Court must begin with a discussion of Federal Law before taking up the Commerce Clause issue.

The United States Congress enacted the Resource Conservation and Recovery Act ("RCRA") in 1976. 42 U.S.C. § 6901, note. The RCRA was a comprehensive effort to resolve the problem of all solid waste disposal in the United States. "Subtitle D" refers to the subchapter of the RCRA dealing with state or regional solid waste plans. 42 U.S.C. § 6941, et seq. In relevant part, Subtitle D provided criteria for the maintenance of sanitary landfills, 42 U.S.C. § 6944, *required* the Governor of each state to create regions within each state to implement mandatory regional solid waste management plans, 42 U.S.C. § 6946, and provided for federal approval of such state plans, 42 U.S.C. § 6947.

Congress apparently concluded that the RCRA as enacted did not go far enough. In 1984, Congress enacted the Hazardous and Solid Waste Amendments to the Resource Conservation and Recovery Act ("HSW Amendments"). 42 U.S.C. § 6949a.

The HSW Amendments directed the Administrator of the Environmental Protection Agency to study the problems of waste disposal and to report to Congress on that study no later than November 8, 1987. The amendments also *mandated* revisions of EPA regulations designed to implement the RCRA not later than March 31, 1988. 42 U.S.C. § 6949a(c).

In August of 1988, the EPA first *proposed* the regulations mandated by the HSW Amendments, i.e., more than four months after the regulations were supposed to have been in effect. The proposed regulations set forth revised minimum criteria for municipal solid waste landfills like the SEAL facility. As the summary to the proposed rule stated, the new mandatory minimum performance standards included "location restrictions, facility design and operating criteria, ground-water monitoring requirements, corrective action requirements, financial assurance, and closure and post-closure care requirements." 53 Fed. Reg. 33314, *et seq.* (August 30, 1988), Plaintiff's Ex. 7. In summary, and as the evidence at trial showed, the proposed regulations would radically increase the costs of disposing of municipal solid waste in landfills like the SEAL facility.

The comment period for the proposed regulations was supposed to end on October 31, 1988. It actually ended on November 30, 1988. 53 Fed.Reg. 41210. As proposed, the regulations required the states to implement the regulations 18 months after EPA adopted them, or after June, 1990 at the *earliest.* 53 Fed.Reg. 33317.

Arkansas' 1989 Act is a reaction to these developments at the federal level. The 1989 Act carefully tailored the moratorium on the expansion of solid waste disposal facilities. The 1989 Act limited the moratorium to a two-year period. The 1989 Act limited existing landfills that served areas outside of their districts at the date of enactment to increasing their out-of-district business by 20 percent. SEAL, like other landfills, was not permitted to accept out-of-district waste for disposal because it had not done so before March 1, 1989. The moratorium imposed by the 1989 Act is not

under the Court's review because it has expired. However, it is clear that the 1989 moratorium prevented a race to dump municipal solid waste as quickly as possible in the State in an attempt to avoid the costs incident to the proposed revised federal regulations.[2]

Since the comment period for the HSW Amendment regulations has expired, the regulations have been under review by EPA. 56 Fed.Reg. 18029 (April 22, 1991). The final regulations have not been published. Arkansas, then, had only the proposed federal regulations, as well as its own study of the problem, as the antecedents to Act 319 of 1991.[3]

The Court concludes that the federal laws and regulations give substantial authority to the states to determine how and where the states choose to dispose of municipal solid waste within their boundaries. The federal laws and regulations do not preempt the Arkansas statutes. However, the Court further concludes that the federal laws do not affirmatively permit the kind of limitations imposed by Act 319. The Court therefore must examine what effect the Arkansas laws have on interstate commerce.

2. *Commerce Clause: Facial Validity of Act 319.*

■ The Court concludes that Act 319 does not violate the Commerce Clause on its face. The Supreme Court examined a similar problem in *City of Philadelphia v. New Jersey*, 437 U.S. 617, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978):

The opinions of the Court through the years have reflected an alertness to the evils of "economic isolation" and protectionism, while at the same time recognizing that incidental burdens on interstate commerce may be unavoidable when a State legislates to safeguard the health and safety of its people. Thus, where simple economic protectionism is effected by state legislation, a virtually *per se* rule of invalidity has been erected. The clearest example of such legislation is a law that overtly blocks the flow of interstate commerce at a State's borders.

*Philadelphia*, 437 U.S. at 623–24, 98 S.Ct. at 2535–36. The *Philadelphia* Court set out guidelines to determine when a state statute was a *per se* violation of the Commerce Clause.

The Arkansas statute does not constitute sheer economic protection against out-of-state commerce. Act 319 is unlike the New Jersey statute at issue in *Philadelphia*. The New Jersey statute completely banned all out-of-state waste disposal at all the State's public and private landfills. The Supreme Court held that such a statute was invalid on its face, irrespective of its purpose. *Philadelphia*, 437 U.S. at 627, 98 S.Ct. at 2537.

The Arkansas statute does not completely ban out-of-state waste. Act 319, like its predecessors, permits the continued importation of four percent of the waste disposed in the State's landfills. Act 319, like its predecessors, permits landfills that receive out-of-district waste to increase their out-of-district waste volume by 20 percent. Most importantly, Act 319, unlike its predecessors, permits landfills that did not receive out-of-district waste as of March 1, 1989, the date the 1989 Act became effective, to begin receiving out-of-district waste in the amount of 50 tons per day. Act 319 therefore permits the continued importation of *out-of-state* waste, and the controlled growth of that waste stream, within the same parameters that it permits importation of *in-state out-of-district* waste. The Court concludes that such a scheme does not fit the Supreme Court's paradigm

---

**2.** In retrospect, the State was well-advised to prevent such a race. The majority of courts that have considered the issue conclude that debtors in bankruptcy *may discharge their pre-petition environmental clean-up costs. See, e.g., In re Chateaugay Corp.,* 112 B.R. 513 (S.D.N.Y.), *aff'd,* 944 F.2d 997 (2nd Cir.1991); *In re Jensen,* 127 B.R. 27 (9th Cir.BAP 1991).

**3.** The EPA apparently issued the final version of the regulations on September 11, 1991, after being sued in the United States District Court for the District of Columbia. The EPA has repeatedly delayed publication of the new regulations in the Federal Register and they are unavailable as of this date.

of a *per se* violation of the Commerce Clause. *Evergreen Waste Systems, Inc. v. Metropolitan Service District*, 820 F.2d 1482, 1484 (9th Cir.1987); *Diamond Waste, Inc. v. Monroe County*, 939 F.2d 941, 944 (11th Cir.1991); *see also, Bill Kettlewell Excavating, Inc. v. Michigan Department of Natural Resources*, 931 F.2d 413 (6th Cir.1991); *Omni Group Farms, Inc. v. County of Cayuga*, 766 F.Supp. 69 (N.D.N.Y.1991).

### 3. *Commerce Clause: Act 319 as Applied.*

■ The Court concludes that Act 319 does not violate the Commerce Clause as the act is applied to SEAL. In *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970), the Supreme Court set out a three part test to determine the validity of a state statute as the Interstate Commerce Clause applied to it:

> ... Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities.

*Pike*, 397 U.S. at 142, 90 S.Ct. at 847 (citations omitted). The Arkansas statute meets all three tests.

First, the statute regulates even-handedly. While Act 319 treats in-district and out-of-district waste differently, it accords all out-of-district waste the same treatment. The evidence at trial proved this. SEAL had the opportunity to import waste from Fayetteville, Arkansas. Defendant's Brief at 40. The Arkansas Department of Pollution Control and Environment rejected Fayetteville's application to dispose of waste in the SEAL facility because of the moratorium imposed by the 1989 Act. The ADPC &

E rejected the out-of-state Davenport contract for the same reasons. Several courts have upheld similar schemes to limit the volume of waste in landfills. *Kettlewell Excavating*, 931 F.2d at 417; *Evergreen*, 820 F.2d at 1484; *Omni Group Farms*, 766 F.Supp. at 76; *see also, Diamond Waste*, 939 F.2d at 945.

Second, the statute effectuates a legitimate local public interest. Courts, Congress, and the executive branch, i.e., the EPA, have unanimously concluded that this is a legitimate local interest. The Supreme Court admitted that New Jersey could protect its citizens' pocketbooks and its environment by slowing the flow of *all* waste into New Jersey's remaining landfills, even though interstate commerce might be affected incidentally. *Philadelphia*, 437 U.S. at 626, 98 S.Ct. at 2536. Other courts agree. *Diamond Waste*, 939 F.2d at 945, 946; *Kettlewell Excavating*, 931 F.2d at 417; *Evergreen*, 820 F.2d at 1484; *Omni Group Farms*, 766 F.Supp. at 76. Arkansas has gone no further than necessary to ensure that its environment is protected, to conserve natural resources, and to provide a continued supply of safe drinking water.

Third, the effect on interstate commerce is only incidental. Less trash will be going into Arkansas landfills from all sources. The legislation at issue affects the 96 percent of the waste that the State generates more than the 4 percent of the waste that the State imports. Act 319 does no more than the Supreme Court would have permitted New Jersey to do in *Philadelphia*. 437 U.S. at 626, 98 S.Ct. at 2536.

The federal government mandates that the states develop regional solid-waste management plans. 42 U.S.C. § 6941, et seq. (RCRA); 42 U.S.C. § 6949a (HSW Amendments); 53 Fed.Reg. 33314, *et seq.* (EPA's proposed regulations implementing HSW Amendments). Considering the federal regulations, the cost of solid-waste disposal is increasing throughout the country. The standards for landfills will be much more stringent in two years. Arkansas has simply decided to anticipate its needs in light of those developments and before there is an acute shortage of landfill space

that may result in potentially long-lasting environmental damage.

When the federal regulations are taken into account, the impact of Act 319 on interstate commerce is only incidental. Act 319 is part of an comprehensive State legislative scheme designed to plan for the recycling, resource recovery, and disposal of all waste. Defendant's Exhibit 7 is a series of bills enacted in 1991 to effect the State's policy given the federal mandate to impose more stringent regulation. The new laws, *inter alia,* establish financing mechanisms for the development of privately-owned solid waste disposal projects that will reduce the cost of creating sufficient landfill space in the State, Act 629; create a "Landfill Post–Closure Trust Fund" to ensure that landfills are environmentally safe for 30 years after they are closed, Act 747; fund a newly-created State board and other facilities to ensure that certain percentages of the municipal solid-waste stream are recycled by certain dates, Act 749; significantly strengthen the licensing and permit procedures for solid waste disposal facilities, Act 750; strengthen the regional solid waste service area boards, Act 752; and increase landfill disposal fees to help fund the State's recycling effort, Act 754.

The Court notes an apparent split in the authorities on this point. Most courts have held that similar statutory schemes have only an incidental effect on interstate commerce. *Evergreen,* 820 F.2d 1485; *Kettlewell,* 931 F.2d at 417–18; *Omni Group Farms,* 766 F.Supp. at 76. The Eleventh Circuit concluded that a county-wide ban on the importation of municipal solid waste was excessive in relation to the local benefit. *Diamond Waste,* 939 F.2d at 944–946.

The holding in *Diamond Waste* is distinguishable. The county-wide ban on the importation of municipal solid waste is more like the New Jersey ban held unconstitutional in *Philadelphia.* The *Diamond Waste* ban was more intrusive than the limited restrictions imposed here or in *Evergreen, Kettlewell,* and *Omni Group Farms.* Moreover, the *Diamond Waste* Court explicitly stated that the county "could reduce the amount of garbage de- posited by setting reasonable daily tonnage limits on imported waste...." *Diamond Waste,* 939 F.2d at 945. That is precisely what Act 319 did when it imposed a 50–ton per-day limit on landfills situated similarly to the SEAL facility.

■ Plaintiff's argument that the State could have used "less restrictive means" is unavailing. Plaintiff argues, in particular, that the State could have restricted the *generators* of municipal solid waste as opposed to the recipients of the waste, i.e., landfills like SEAL. In response, Mr. Randall Mathis, Director of the Department of Pollution Control and Ecology, testified that plaintiff's suggestion "may have been a good idea" but was not part of Act 319. Transcript at 41.

The State did, in fact, enact restrictions on the generators of certain types of waste in 1991. The problem of solid waste disposal cannot be viewed in isolation. The Act 319 moratorium is only part of the State's attempt to implement a comprehensive long-range solution to the solid waste disposal problem. Act 749 of 1991, part of defendant's exhibit 7, creates a variety of incentives to recycle. In particular, Act 749 imposes fees on the sale of each new motor vehicle tire. Ark.Code Ann. § 8–9– 404.

The State also will prohibit the disposal of yard waste, i.e., grass clippings, leaves, brush, and tree prunings, in landfills beginning on July 1, 1993. Act 751 § 4, Ark. Code Ann. § 8–6–220. As the Report of the Arkansas Solid Waste Fact Finding Task Force states, yard wastes account for 17.6 percent of the waste stream and 10.3 percent of the volume in landfills. Plaintiff's Ex. 20 at 9–4. This represents one of the most significant "source reductions" possible in this State.

The length of time in which the limitations remain in effect does not change the Court's analysis. Mr. Mathis also testified that the 1989 Act, as originally proposed, did not contain a moratorium. The legislature added the moratorium, which, as Mr. Mathis testified, strengthened the State's position and forced localities to work together to solve the solid waste disposal

problems of the State. Transcript at 41. The limits Act 319 imposes remain in effect until each district and the State as a whole has a 10–year landfill capacity. That time limit is rationally related to the State's purpose. It forces localities to make long-term plans for a long-term problem. Given the federal government's recognition that solid waste disposal remains a problem for 30 years after it disposal, the Court concludes that Arkansas' time limitations do not violate the Commerce Clause.

The Court concludes that the State's interest in maintaining its environment far outweighs the need to find any less restrictive alternative than that imposed on SEAL. The State did impose the "less restrictive" alternative suggested by plaintiff, i.e., limiting the generation of solid waste for disposal in the State's landfills. Both limitations are part of a global scheme to address the problem of solid waste disposal in the State. The Constitution does not require the State to enact a scheme that is less burdensome on SEAL even if such a scheme were "more" rational. The Act 319 restrictions are rationally related to the purpose they serve. The State need not do any more than it already has done to limit the impact of those restrictions. *See, Railway Express Agency, Inc. v. New York*, 336 U.S. 106, 111, 69 S.Ct. 463, 466, 93 L.Ed. 533 (1949) (No Commerce Clause violation to prohibit advertisements on trucks for any product other than the product of the company owning the trucks) (*citing, South Carolina Highway Dept. v. Barnwell Bros.*, 303 U.S. 177, 187, 58 S.Ct. 510, 514, 82 L.Ed. 734 (1938)).

■ Finally, the Court concludes that the statute is not invalid as applied to SEAL. The effect of Act 319 is to ban the importation of any more than 50 tons of out-of-district waste into the SEAL facility. The ban applies to waste from Fayetteville, Arkansas as well as to waste under the Davenport contract. This is not an absolute ban. The record shows that Davenport contract with SEAL initially called for the importation of 50 tons of waste per day. SEAL gave no reason that it could not begin importing that amount of waste.

While Act 319 may foreclose SEAL's planned imports of up to 5000 tons of baled municipal waste per day, the effects of the statute are not impermissible under *Philadelphia* and *Pike*. See, *Kettlewell*, 931 F.2d at 418.

## B. IMPAIRMENT OF CONTRACTS CLAUSE

■ The Court concludes that Act 319 and its predecessors do not impermissibly impair SEAL's contract with Davenport in violation of the Contracts Clause, U.S. Const. art. I, § 10, cl. 6. A recent Supreme Court opinion states the test the Court must apply:

... [T]he Contract Clause does not operate to obliterate the police power of the States. It is the settled law of this court that the interdiction of statutes impairing the obligation of contracts does not prevent the State from exercising such powers as are vested in it for the promotion of the common weal, or are necessary for the general good of the public, though contracts previously entered into between individuals may thereby be affected. This power, which, in its various ramifications, is known as the police power, is an exercise of the sovereign right of the Government to protect the lives, health, morals, comfort and general welfare of the people, and is paramount to any rights under contracts between individuals. As Mr. Justice Holmes succinctly put the matter in his opinion for the Court in *Hudson [County] Water Co. v. McCarter*, 209 U.S. 349 [28 S.Ct. 529, 52 L.Ed. 828 (1908)], "One whose rights ... are subject to state restriction, cannot remove them from the power of the State by making a contract about them. The contract will carry with it the infirmity of the subject-matter."

*Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 241–42, 98 S.Ct. 2716, 2720–21, 57 L.Ed.2d 727 (1978) (some internal citations omitted); *accord, Keystone Bituminous Coal Association v. DeBenedictis*, 480 U.S. 470, 503–504, 107 S.Ct. 1232, 1251–52, 94 L.Ed.2d 472 (1987); *Whirlpool Corp.*

*v. Ritter*, 929 F.2d 1318, 1322 (8th Cir. 1991).

The Supreme Court further examined the limits imposed by the Contract Clause in a series of cases. For the purposes of this case, the applicable precedent is *Home Building & Loan Assn. v. Blaisdell*, 290 U.S. 398, 54 S.Ct. 231, 78 L.Ed. 413 (1934). In *Blaisdell*, the Supreme Court upheld against a Contract Clause attack a mortgage moratorium law that Minnesota had enacted to provide relief for homeowners threatened with foreclosure. The Supreme Court also enumerated several specific characteristics that were critical to its holding. The Court will enumerate them as they apply to the instant case.

Arkansas retains the "residual authority to enact laws to safeguard the vital interests" of its residents even if such legislation directly conflicts with SEAL's contractual rights. *Spannaus*, 438 U.S. at 242, 98 S.Ct. at 2721. The Arkansas legislature declared in both the 1989 Act and Act 319 that there was an emergency need for the protection of the State's environment. The legislature enacted Act 319 and its predecessors to protect a basic societal interest in the environment and not to protect a favored group. The legislature narrowly tailored the relief in the statutes, as discussed above, to the emergencies the statutes are designed to meet. The conditions imposed by the State, i.e., a 50–ton per day limit at SEAL, are reasonable. Finally, the legislature limited the moratorium to the duration of the emergency, i.e., until each district and the State as a whole have a ten-year landfill capacity under the more stringent federal regulations. These are the same conditions the Supreme Court found dispositive in *Blaisdell*. *Spannaus*, 438 U.S. at 242, 98 S.Ct. at 2721.

Plaintiff argues that the Arkansas legislation is *not* reasonable. In particular, the proof at trial showed that the legislation only had a remedial effect to the extent it forced landfills to close and to the extent that it forced districts with limited landfill capacity to come to the bargaining table with districts with excess capacity. The proof also showed that the Department

forced SEAL to limit its out-of-district waste intake to 20 percent of its former waste stream of 25 tons per day, i.e., an additional 5 tons [or up to 50 tons under Act 319] per day. Yet the Department permitted other landfills to receive more waste even though they had less available capacity than SEAL claims to have had. As a consequence, other landfills received out-of-district waste even though SEAL claimed that these landfills were polluting the groundwater around them.

The Court agrees that it would be a tragic consequence of the statutory scheme if it encouraged groundwater pollution. The purpose of the legislation is to protect the environment of the State and the health of its citizens. The issue before the Court was not the extent to which *other* landfills may be violating *other* health and safety regulations. The Department was not obligated to rebut those claims here; rather, it is responsible to the people of this State, not to this Court, to monitor those landfills and to enforce the appropriate regulations.

The critical issue before the Court is the reasonableness of the legislative scheme. As the Court stated above, Arkansas need not enact the *most* reasonable scheme, it need only enact *a* reasonable scheme. The Court is aware of the constraints inherent in the political process. That process does not always lead to the *most* rational legislation. What Arkansas has done, however, is to ensure that the repositories of the current municipal solid waste stream are well capitalized, experienced, and prepared to meet the anticipated stringent federal requirements for landfills. Even if there are temporary or isolated shortcomings to the strategy, the strategy as a whole is viable.

The Court also concludes that SEAL is unable to meet the requirements of the contract it has been assigned. The contract states:

ACW [Arkansas County Waste, the assignor] warrants that the designated landfill in Arkansas is and has been operated in substantial compliance with applicable federal, state and local laws, permits and licenses and in an environmen-

tally sound manner and is authorized by its respective state environmental regulatory agency to accept NSW [nonhazardous solid waste] from the out-of-state sources and at the volume to be provided by Davenport.

Plaintiff's Ex. 11, Waste Disposal Agreement (a/k/a the Davenport Contract) at 5 ¶ 8. The proof at trial showed that SEAL had *not* been operating in substantial compliance with applicable laws.

At an unannounced site visit in November, 1986, the defendant found substantial compliance problems at SEAL. Among other problems: SEAL had not been operating according to its permitted design; the actual waste in the landfill was "poorly compacted and badly covered"; blowing litter was observed all over the site; the inspectors observed leachate leaving the site; and SEAL had not properly conducted the required groundwater monitoring since its opening in 1982. Defendant's Ex. 1.

As a consequence of this surprise inspection, SEAL entered into a Consent Administrative Order that provided for SEAL to increase substantially the environmental quality of its landfill. Defendant's Ex. 6. SEAL claims to have followed this Order. Mr. Gray Varnadore, President of the corporation, testified that SEAL was a "Class I" landfill, which followed the strictest environmental policies. Plaintiff also introduced two reports showing that SEAL would be viable as a high-volume Class I landfill. Plaintiff's Ex. 3, Geotechnical and Hydrology Study; Plaintiff's Ex. 4, Engineering Report and Operations Narrative.

The Court finds that SEAL is not a viable Class I landfill. Mr. Varnadore testified that SEAL only started to meet the requirements of a Class I landfill; it had not fulfilled its own Class I plan. Mr. Varnadore claimed to be able to complete within 10 days all the work on the SEAL facility necessary to satisfy the Davenport contract and the applicable authorities. The Court discredits this testimony. On the contrary, the liners and the leachate collection system both need to be installed and certified. The Court finds that such an undertaking, which SEAL has had more than two years to do, is unlikely to be completed in 10 days. SEAL does not dispute that it does not have the funds available to carry out the capital improvements needed to fulfill the conditions of its contract.

■ The Court also concludes that SEAL's failure to satisfy the terms of its permit is fatal to its Contract Clause claim. After the 1986 inspection, the Department modified the permit for the SEAL facility. Without discussing SEAL's compliance or noncompliance with the other conditions, the Court notes the most egregious shortcoming. The additional permit conditions provided, *inter alia*, that: "Baled municipal waste and bulk process waste ... shall require written authorization from the [defendant] prior to disposal." Plaintiff's Ex. 1, SEAL Permit, at 2, ¶ 12. The Davenport contract provided for baled waste *exclusively*. SEAL does not dispute that it never obtained the written authorization from the defendant to dispose of baled waste.

## C. INVERSE TAKING

The Court concludes that there has not been an inverse taking as a result of the Arkansas legislation in violation of either the United States Constitution, amend. V, cl. 3, or the Arkansas State Constitution, art. II, § 22. Plaintiff claims that the effect of the legislation deprives it of the economic benefit of the land in violation of the Fifth Amendment prohibition against taking private property without just compensation as applied to the states through the Fourteenth Amendment, U.S. Const. amend. XIV, § 1, cl. 3. Defendant refutes the claim because the legislation merely diminishes the value of plaintiff's property but does not deprive plaintiff of its use entirely.

The Supreme Court has had the opportunity to review the question of what constitutes a "taking" by regulation:

... We have long recognized that land-use regulation does not effect a taking if it "substantially advance(s) legitimate state interests" and does not "den(y) an owner economically viable use of his land," *Agins v. Tiburon*, 447 U.S. 255,

260 [100 S.Ct. 2138, 2141, 65 L.Ed.2d 106] (1980). See also *Penn Central Transportation Co. v. New York City*, 438 U.S. 104, 127 [98 S.Ct. 2646, 2660, 57 L.Ed.2d 631] (1978) ("(A) use restriction may constitute a 'taking' if not reasonably necessary to the effectuation of a substantial government purpose"). Our cases have not elaborated on the standards for determining what constitutes a "legitimate state interest" or what type of connection between the regulation and the state interest satisfies the requirement that the former "substantially advance" the latter. They have made clear, however, that a broad range of governmental purposes and regulations satisfies these requirements [citing cases involving scenic zoning, landmark preservation, and residential zoning, all of which hold that the governmental interest satisfies the requirements].

*Nollan v. California Coastal Commission*, 483 U.S. 825, 834–35, 107 S.Ct. 3141, 3147–48, 97 L.Ed.2d 677 (1987).

■ The Court concludes that Arkansas has a legitimate interest in protecting the health, safety, and welfare of its populace and in protecting its environment. The laws and regulations at issue substantially advance those interests. There is no proof in the record that the regulations completely deny SEAL an economically viable use of its land. The State legislation possibly may diminish the future value of the property if SEAL had the capital to develop the landfill. Diminution in value, standing alone, does not establish a "taking." *Scott v. Sioux City*, 736 F.2d 1207, 1217 (8th Cir.1984). The Court's analysis applies, *mutatis mutandis*, to the Arkansas constitutional claim. *Barrett v. Poinsett County*, 306 Ark. 270, 811 S.W.2d 324 (1991) (county zoning ordinance prohibiting use of county land as landfill did not constitute "taking" of plaintiffs' land). Plaintiff has not put on any proof that would take its claim outside this general rule. The Court concludes that there has been no taking. *See generally, Penn Central*, 438 U.S. 104, 98 S.Ct. 2646.

## D. DUE PROCESS AND EQUAL PROTECTION

■ The Court concludes that there has been no violation of plaintiff's due process or equal protection rights, U.S. Const. amend. XIV, § 1, cl. 3 and cl. 4. The Eighth Circuit recently reviewed the standard for evaluating plaintiff's claim in this regard:

States are accorded wide latitude in the regulation of their local economies under their police powers, and rational distinctions may be made with substantially less than mathematical exactitude.... (I)n the local economic sphere, it is only the invidious discrimination, the wholly arbitrary act, which cannot stand consistently with the Fourteenth Amendment.

*MSM Farms, Inc. v. Spire*, 927 F.2d 330, 332 (8th Cir.1991) (*citing, New Orleans v. Dukes*, 427 U.S. 297, 303–304, 96 S.Ct. 2513, 2516–2517, 49 L.Ed.2d 511 (1976) (upholding New Orleans ordinance banning pushcart food vendors from certain parts of the city notwithstanding grandfather provision permitting those food vendors who had been in operation for eight or more years to continue their operations)). The Eighth Circuit also stated that:

Social and economic measures ... run afoul of the equal protection clause only when the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the legislatures' actions were irrational.

*MSM Farms*, 927 F.2d at 332.

As the Court discussed above, the Arkansas legislature had a rational basis to adopt the legislation at issue. The 20 percent allowance in the 1989 Act and the additional 50–ton per day allowance in Act 319 are not invidiously discriminatory. The legislature did not act irrationally when it enacted this legislation. The Court concludes that Act 319 and its predecessors must be upheld under both the due process clause and the equal protection clause of the Fourteenth Amendment.

### III. PROPOSED CONCLUSIONS OF LAW

There is no basis for granting plaintiff declaratory or injunctive relief. Based on a review of the entire record, the Court concludes that defendant's complaint should be dismissed and the relief sought denied.