**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ERNESTINE CHING YOUNG,
individually; ERNESTINE C. YOUNG,
Trustee of the Wallace L. Young
Trust dated April 12, 2005
(Residuary Trust); JAMES M.
SHERMAN, AKA James Malcolm
Sherman; AKIKO S. SHERMAN,
Trustees under that certain
unrecorded James M. Sherman and
Akiko S. Sherman Revocable
Trust, AKA Akiko Sakiyama
Sherman; JAN CAMILLE BELLINGER,
Trustee of the Jan Camille
Bellinger Revocable Living Trust,
under that certain unrecorded
Trust Agreement dated November
23, 1993; DAVID PATRICK KELLY;
KEIKO KELLY; FREDERICK AHN;
MYRNA P. CHUN-HOON, Successor
Trustee under that certain
unrecorded Revocable Trust of
Albert C.K. Chun-Hoon dated
October 11, 1984, as amended;
MYRNA P. CHUN-HOON, Trustee
under that certain unrecorded
Revocable Trust of Myrna P.
Chun-Hoon dated October 11,
1984; STUART EDWIN GROSS,
Trustee under that certain
unrecorded Trust Agreement of
Stuart E. Gross dated February 19,
1985;

No. 09-16034

D.C. No.
1:07-cv-00068-
JMS-LEK

3873

MARCIA KURZWEIL GROSS, Trustee
under that certain unrecorded
Trust Agreement of Marcia K.
Gross dated February 19, 1985;
RANDY NEIL YEAGER; SUSAN
KAYCIE YEAGER; KENNETH GRAHAM
PATTERSON; LILLIAN PAPACOLAS
PATTERSON; ELAINE N. MIN,
Trustee under that certain Trust
Agreement dated April 9, 1985,
AKA Elaine Nam Min; ARTHUR R.
KING, JR.; RUTH MILDRED KING,
Co-Trustees of the unrecorded
Arthur R. King, Jr. Trust
Agreement dated May 18, 1990,
and Co-trustees of the unrecorded
Ruth Mildred King Trust
Agreement dated May 18, 1990;
LAWRENCE REICH; JOYCE ANDREA
HAGIN; PAUL JOHN CASEY, Trustee
under that certain unrecorded Self-
Trusted Trust dated August 31,
1987; JANICE YOKO CASEY, Trustee
under that certain unrecorded Self-
Trusted Trust dated May 20, 1988;
GEORGE HENRY LUMSDEN; JOANN
CHUN LUMSDEN;

ANN TAKAKO YAMAMOTO, Trustee
of the Self-Trusted Trust
Agreement of Ann Takako
Yamamoto, under unrecorded
Trust Agreement of Ann Takako
Yamamoto, dated April 10, 2000;
DONALD ARTHUR CLOTHIER;
CHRISTINE ADELE SERAFIN-
CLOTHIER; FRANCES M. WATANABE,
Trustee under that certain
unrecorded Frances M. Watanabe
Revocable Trust dated April 2,
1993; JACQUELINE LEE SUSIE EARLE,
Trustee under that certain
unrecorded Jacqueline L.S. Earle
Trust dated June 30, 2004; GAIL
SUZANNE KOGLMAN; NEIL SIMMS
BELLINGER, individually, and as
Trustee under that certain
unrecorded Neil S. Bellinger
Revocable Living Trust dated
November 20, 2002,
                    *Plaintiffs-Appellants,*

                    v.

CITY AND COUNTY OF HONOLULU,
                    *Defendant-Appellee.*

KATHLEEN M. BARR, Trustee of the
Sally A. Matsuda Self-Trusteed
Trust dated October 15, 1993;
RALPH JAMES MITCHELL; LUCY
MITCHELL; NOOSHA FESHARAKI;
EARL KIDDER; JEENIE MARIE
KIDDER; JAMES RAPISARDA;
JONATHAN VON BRANA; THOMAS
PRESTON; LOREN HOHMAN; HERBERT
CAPLAN, Co-Trustee of the Herbert
Caplan and Elena V. Pecile Trust
dated March 27, 2003; ELENA
PECILE, Co-Trustee of the Herbert
Caplan and Elena V. Pecile Trust
dated March 27, 2003; WILMA
PARKER, Trustee of the Wilma I.
Parker Trust dated March 16, 1989
as amended; TROY WILLIAMS;
LARRY WEISNER; DELORES WEISNER;
MARIANNE MARION JAEGER;
RICHARD JOHNSON; WILLIAM
GARRETT FUSON; KANG YUK LEE;
SUK JA LEE; CLAUDE ROTHE,
Trustee of the Claude R. Rothe
Living Trust dated March 26,
1998; ALVIN OLSON, Trustee under
Alvin R. Olson Revocable Trust
Agreement dated July 20, 1998;
NATALIA INDRASARI;

No. 09-16495

D.C. No.
1:05-cv-00125-
DAE-LEK

OPINION

WARREN SWEET, Trustee of the Sweet John Revocable Trust dated June 21, 1991; RHEBA ALICE SWEET; ROBERT MEHRING; AYUMI WATANABE MEHRING; MARIANA FLEMMINGS, Co-Trustee of the Arnold Theodore Flemmings and Mariana Flemmings Revocable Living Trust dated December 6, 1999; ARNOLD FLEMMINGS, Co-Trustee of the Arnold Theodore Flemmings and Mariana Flemmings Revocable Living Trust dated December 6, 1999; MELVIN TAKEO MATSUOKA; DELWIN SCHNEIDER, Trustee under the Delwin Byron Schneider and Katherine Louise Schneider Family Trust dated October 14, 1996; KATHERINE SCHNEIDER, Trustee under the Delwin Byron Schneider and Katherine Louise Schneider Family Trust dated October 14, 1996; RONALD SILVERMAN; FARHAD SIMYAR; FRANK WINSTON KERN; SOUSSAN SIMYAR; RICHARD L. JAEGER,

*Plaintiffs-Appellants,*

v.

CITY AND COUNTY OF HONOLULU, a municipal corporation of the State of Hawaii,

*Defendant-Appellee.*

Appeal from the United States District Court
for the District of Hawaii
J. Michael Seabright, District Judge, Presiding
David A. Ezra, District Judge, Presiding

Argued and Submitted
August 13, 2010—Honolulu, Hawaii

Filed March 22, 2011

Before: Diarmuid F. O'Scannlain, A. Wallace Tashima, and
Milan D. Smith, Jr., Circuit Judges.

Opinion by Judge O'Scannlain

## COUNSEL

David A. Nakashima, Alston Hunt Floyd & Ing, Honolulu, Hawaii, argued the cause for the Appellants and filed briefs. With him on the briefs were J. Blaine Rogers, Alston Hunt Floyd & Ing, Honolulu, Hawaii.

Don S. Kitaoka, Deputy Corporation Counsel, City and County of Honolulu, Hawaii, argued the cause for the Appellee and filed a brief. With him on the brief were Carrie K. S. Okinaga, Corporation Counsel, and Kyle K. Chang, Brad T. Saito, and Jesse K. Souki, Deputies Corporation Counsel, City and County of Honolulu, Hawaii.

## OPINION

O'SCANNLAIN, Circuit Judge:

We are called upon to decide whether the City of Honolulu violated the Contracts Clause of the United States Constitution when it repudiated several agreements to convey property

to private citizens in connection with its leasehold conversion program.

I

A

In 1991, the City and County of Honolulu (the "City") enacted an ordinance, later codified at Chapter 38 of the Revised Ordinances of Honolulu ("Chapter 38"), which created a mechanism allowing condominium lessees to convert their leasehold interests into fee interests through the City's power of eminent domain.[1] As we have previously explained,

> Chapter 38 was a response to Hawaii's long history of feudal land ownership, which survived well after American acquisition. At the time of Chapter 38's enactment, a small handful of landowners owned the vast majority of land in the State. Despite the efforts of Hawaii's leaders to divide these large Hawaiian land estates, the system persisted, driving the price of land in Hawaii to exorbitant heights. Taking advantage of this status quo, Hawaiian landowners rarely sold their estates. Instead, they frequently leased their land for long terms, often to developers who would construct condominiums on the property and then sell the units subject to the ground lease.

*Matsuda v. City & Cnty. of Honolulu*, 512 F.3d 1148, 1150 (9th Cir. 2008) (citations omitted).

To break the land-ownership gridlock, the City enacted Chapter 38, which provided that when a sufficient number of lessees within a condominium complex applied, the City would take steps to acquire the property on which the com-

---

[1] The Hawaii Legislature has delegated the power of eminent domain to the City. *See* Haw. Rev. Stat. § 46-1.5(6).

plex was built through its power of eminent domain. *See generally* Revised Ordinances of Honolulu § 38 (repealed 2005). If successful, the City would then convey each condominium unit and the appurtenant land to its lessee in fee simple.

Specifically, when an application was filed, the City's Department of Community Services ("DCS") would make a preliminary determination of whether the applicants met Chapter 38's requirements. City & County of Honolulu Rules for Residential Condominium, Cooperative and Planned Development Leasehold Conversion § 2-3 (Sept. 28, 2000) [hereinafter "Chapter 38 Rules"]. Upon preliminary approval, the DCS would hold a public hearing to determine whether acquisition and transfer of the property would "effectuate the public purpose of Chapter 38." *Id.* § 2-6. If the DCS found that such purpose would indeed be effectuated, it would initiate proceedings to acquire the property through the City's power of eminent domain.

The DCS, however, could not exercise the power of eminent domain itself; such power lies within the City Council alone. *Richardson v. City & Cnty. of Honolulu*, 868 P.2d 1193, 1205-06 (Haw. 1994). Instead, the DCS would designate the relevant property for condemnation and present the City Council with a resolution for the exercise of its eminent domain power. Chapter 38 Rules §§ 2-11, 2-12. Before condemnation could take place, the City Council would itself determine whether such action would be "in the public interest." Haw. Rev. Stat. § 46-1.5(6). If the City Council adopted a resolution to condemn the property, the City would then sell the property to the respective Chapter 38 applicants within sixty days after its acquisition. Chapter 38 Rules § 2-19.

B

In 2004, the City Council began consideration of various measures that would repeal Chapter 38. After entertaining several initial proposals, it adopted Ordinance 05-001 (the

"Repeal Ordinance"), which recited the City Council's view that "Chapter 38 no longer serves a public purpose and should be repealed," Honolulu, Haw., Ordinance 05-001 § 1 (Feb. 9, 2005). Under the Repeal Ordinance's savings clause, Chapter 38's repeal did "not affect any eminent domain proceeding for the acquisition of units . . . the condemnation of which . . . was approved by the council by resolution before the effective date" of the ordinance. *Id.* § 3. The Repeal Ordinance went into effect on February 9, 2005.

### C

This appeal was brought by two groups of condominium lessees (collectively, "Lessees") who had entered into contracts with the City under Chapter 38. One group holds leasehold interests in units at the Discovery Bay condominium complex. The second group holds leasehold interests in units at the Admiral Thomas condominium complex.

All Lessees applied under Chapter 38 to acquire fee interests in their condominium units. Upon receipt of Lessees' applications, the City entered into an identical "Leased Fee Interest Purchase Contract" ("Agreement") with each. Under the Agreements, each Lessee paid a $1000 deposit in exchange for the City's promise that, upon successful acquisition of the property, it would convey fee interest to the Lessee in his condominium unit. The Agreements incorporated Chapter 38's condemnation proceedings as the mechanism for acquiring the properties. The Agreements further provided that the arrangement "is expressly conditioned upon the City's successful acquisition of the Property through the exercise of the power of eminent domain, and that the failure of the City to acquire the Property . . . will render this contract null and void." The parties promised to "use their best efforts to perform the actions required in order to consummate the transaction."

1

In 2004, the DCS approved the Discovery Bay Lessees' Chapter 38 applications and referred the matter to the City Council. The City Council then began consideration of a resolution to acquire the relevant property though its power of eminent domain. In late 2004, however, the City Council deferred its decision on the resolution pending consideration of the Repeal Ordinance. The City Council never did pass a resolution authorizing condemnation of Lessees' condominium units.

The Discovery Bay Lessees filed suit against the City in the United States District Court for the District of Hawaii, arguing that the Repeal Ordinance violated the Contracts Clause and the Fourteenth Amendment's Due Process Clause. In 2005, the district court granted summary judgment in favor of the City, concluding that the Agreements were void *ab initio*, under the reserved powers doctrine. *Matsuda v. City & Cnty. of Honolulu*, 378 F. Supp. 2d 1249, 1257 (D. Haw. 2005). On appeal, we vacated the district court's decision, holding that the Agreements did not run afoul of the reserved powers doctrine. *Matsuda*, 512 F.3d at 1154-55. We remanded the case to the district court for consideration on the merits of Lessees' constitutional claims. *Id.* at 1157.

Upon remand, the Discovery Bay Lessees amended their complaint, which again alleged violations of the Contracts Clause and Due Process Clause and which raised related claims under 42 U.S.C. § 1983 for violation of these constitutional rights. The Lessees also alleged state-law breach of contract claims. The district court granted summary judgment in favor of the City on the federal claims, concluding that the City had satisfied all of its contractual obligations to Lessees, and that the Repeal Ordinance did not violate due process, as it was rationally related to a legitimate government purpose. The district court then dismissed the remaining state-law claims. The Discovery Bay Lessees timely appeal.

2

From 2001 to 2004, the DCS processed three different groups of Chapter 38 applications from residents of the Admiral Thomas. By 2003, the City Council authorized condemnation of the first two groups' condominium units, and the City subsequently initiated condemnation lawsuits to acquire such property. In 2004, the DCS approved a third group of Admiral Thomas applicants, but the City Council deferred consideration of whether to authorize condemnation proceedings as it contemplated the Repeal Ordinance. As with the Discovery Bay applications, the City Council never did pass a resolution authorizing condemnation of this third set of condominium units.

This third group of Admiral Thomas Lessees filed suit against the City, raising the same claims as the Discovery Bay Lessees. As with the Discovery Bay Lessees, the district court granted summary judgment to the City on the Admiral Thomas Lessees' federal-law claims and dismissed the remaining state-law claims. The Admiral Thomas Lessees also timely appeal.

3

The two appeals have now been consolidated. The only issue raised on appeal is whether the district court erred in granting summary judgment in favor of the City on Lessees' Contracts Clause claims.

II

**[1]** The Contracts Clause of the Constitution provides that "[n]o State shall . . . pass any . . . Law impairing the Obligation of Contracts." U.S. Const. art. I, § 10. This clause, of course, "impose[s] some limits upon the power of a State to abridge existing contractual relationships." *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 242 (1978) (emphasis

omitted). But, despite its seemingly absolute language, the clause does not prohibit a State from acting "for the general good of the public," even where contractual obligations may be affected. *Id.* at 241. Rather, the Contracts Clause has been construed "narrowly in order to ensure that local governments retain the flexibility to exercise their police powers effectively." *Matsuda*, 512 F.3d at 1152.

**[2]** Where, as here, a state "interferes with its own contractual obligations," we must "examine the state's conduct with a higher level of scrutiny." *Id.* Specifically, in determining whether the Repeal Ordinance violated the Contracts Clause, we apply the test first announced by the Supreme Court in *United States Trust Co. v. New Jersey*, 431 U.S. 1 (1977). Under that test, we consider whether the ordinance "has, in fact, operated as a substantial impairment of a contractual relationship," and, if so, whether the ordinance is "justified by a significant and legitimate public purpose" and is "both reasonable and necessary to fulfill [such] public purpose." *Matsuda*, 512 F.3d at 1152 (internal quotation marks omitted) (alteration in original).

A

First, we ask whether the Repeal Ordinance substantially impaired a contractual relationship. As there is no dispute that the Agreements created valid contractual relationships between Lessees and the City, we consider whether the Repeal Ordinance impaired those relationships, and, if so, whether any impairment was substantial.

**[3]** To have impaired Lessees' contractual relationships, the Repeal Ordinance must have caused the City to breach its contractual obligations and have "create[d] a defense to the breach that prevents the recovery of damages." *Univ. of Haw. Prof'l Assembly v. Cayetano*, 183 F.3d 1096, 1102 (9th Cir. 1999). The ultimate goal of the Agreements was to have the City obtain title to Lessees' housing units through condemna-

tion proceedings and, if successful, to convey such title to Lessees. But all parties agree that the City's obligation to condemn Lessees' condominium units was expressly conditioned upon the City Council first determining that such condemnation would further the public interest. In other words, the Agreements clearly contemplated that the City might choose *not* to condemn Lessees' property. There is thus no doubt that the City did not impair its contractual obligations simply by failing to condemn and convey Lessees' land.

1

Instead, Lessees argue that the City abdicated its contractual obligation to "use [its] best efforts to perform the actions required in order to consummate the transaction contemplated by [the Agreements]." Lessees argue that the City "abandoned all efforts" to consummate the relevant land sales by repealing Chapter 38.

**[4]** Under the Agreements, the City was obligated to use its best efforts only in *pursuing* the discretionary condemnation process. *See Matsuda*, 512 F.3d at 1154 ("Chapter 38 imposed several requirements for a successful condemnation which were beyond the City's power to control, and the City only agreed to use its best efforts to achieve those results."). Because the City could not condemn Lessees' property without prior approval by the City Council, the City maintained no further duties under the Agreements if the City Council chose not to approve such condemnation. This is precisely the determination the City Council made in passing the Repeal Ordinance.

Upon Lessees' applications, the DCS completed the preliminary steps of the condemnation process and then prepared resolutions for the condemnation of Lessees' property. The City Council withheld voting on these resolutions as it considered, more broadly, whether condemnation of *any* property under Chapter 38 still served the public interest. Ultimately,

the City Council voted to repeal Chapter 38, finding that "mandatory conversion of multi-family residential leaseholds under Chapter 38 is no longer needed to assuage the social and economic problems . . . and, therefore, *no longer advances a public purpose* for which the city should exercise its extraordinary powers of condemnation." Honolulu, Haw., Ordinance 05-001 § 1 (Feb. 9, 2005) (emphasis added).

**[5]** Contrary to the Lessees' contention, this ordinance did not legislate away the City's contractual obligations. Rather, the Repeal Ordinance simply reflects the City Council's judgment that no further condemnations under Chapter 38—including condemnation of Lessees' property—would promote the public interest. The Agreements explicitly contemplated that the City Council might make such a determination, and there is nothing in the record to suggest that the Council did so in bad faith or without due care.[2] Thus, Lessees' argument regarding the best efforts clause is inapposite. Such clause created no duty to condemn Lessees' property and imposed no barrier to the passage of the Repeal Ordinance.[3]

---

[2]The closest Lessees come to showing bad faith or lack of due care is in arguing that the Repeal Ordinance's savings clause—which permits condemnation actions already in progress to proceed—suggests that the City Council actually believed that condemnation proceedings still *did* promote the public interest. Lessees argue that the City's failure to consider whether to condemn their specific housing units was therefore irrational.

But the savings clause in no way undermines the City Council's conclusion that "Chapter 38 is *no longer needed* to assuage the social and economic problems" of Hawaii's historical pattern of land ownership. Honolulu, Haw., Ordinance 05-001 § 1 (Feb. 9, 2005) (emphasis added). In other words, previous condemnation actions, including those currently underway, had likely remedied the problem that Chapter 38 was passed to combat. This conclusion is entirely consistent with the City's view that no further condemnation actions were warranted.

[3]Along these same lines, the Repeal Ordinance did not violate the City's implied duty of good faith and fair dealing under the contract. *See Best Place, Inc. v. Penn Am. Ins. Co.*, 920 P.2d 334, 337-38 (Haw. 1996). Like

2

Lessees contend that it is unreasonable to read the Agreements to permit the City to repeal Chapter 38, as such leeway would render the entire contract illusory. Specifically, Lessees argue that this interpretation would allow the City unilaterally to change the terms of the Agreements, and thus fails to bind the City to any obligations. Under such a reading, the contracts would be void for lack of mutuality of consideration. *See Douglass v. Pflueger Haw., Inc.*, 135 P.3d 129, 144 (Haw. 2006).

**[6]** But the Agreements impose several obligations upon the City, even if the City is not required ultimately to condemn Lessees' property. For example, upon a proper application, the DCS must—as it did—conduct preliminary hearings to assess the public necessity of condemnation. If preliminary approval is given, the City Council must—as it did—consider whether condemnation will serve the public interest. Moreover, if the City Council *were* to find condemnation appropriate, and eminent domain proceedings were successful, the City would be obligated to transfer ownership of the relevant properties to Lessees. These are significant and binding contractual obligations, and thus the Agreements are well supported by mutual consideration. The Repeal Ordinance did not breach any of these obligations, and it therefore did not impair the City's contractual relationships with the Lessees. *See Univ. of Haw. Prof'l Assembly*, 183 F.3d at 1102.

B

**[7]** Having determined that the Repeal Ordinance did not impair the City's contractual relationships with Lessees, we

---

the best efforts clause, this implied duty did not require the City to condemn Lessees' property, but required merely that it exercise its discretion over such condemnation in good faith. As there is no evidence that the City Council acted in bad faith by passing the Repeal Ordinance, the implied duty was not breached.

need not consider the remaining prongs of the *U.S. Trust* test. Without contractual impairment, the Repeal Ordinance could not have violated the Contracts Clause, and Lessees' argument to the contrary fails.

### III

For the foregoing reasons, the district court did not err in granting summary judgment to the City on Lessees' Contracts Clause challenge and derivative section 1983 suit.

The judgment of the district court is

**AFFIRMED.**